**JACKSON v. NORTHWEST AIRLINES, Inc., et al.**

**MURPHY et al. v. NORTHWEST AIRLINES, Inc., et al.**

**MURPHY et al. v. NORTHWEST AIRLINES, Inc. (five cases).**

Nos. 760, 939, 949, 972, 982, 1005, 1024.

*District Court, D. Minnesota, Third Division.*
Jan. 18, 1947.

A. H. Markert and John A. Burns, both of St. Paul, Minn., for plaintiffs in No. 760.

Mark H. Gehan, of St. Paul, Minn., for plaintiffs in all actions except No. 760.

Charles S. Kidder, of St. Paul, Minn. (Orr, Stark & Kidder, of St. Paul, Minn., of counsel), for intervener in No. 760.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

Michael J. Doherty and Pierce Butler, both of St. Paul, Minn. (Doherty, Rumble, Butler, Sullivan & Mitchell, of St. Paul, Minn., of counsel), amicus curiae, for Air Transport Association of America.

NORDBYE, District Judge.

Plaintiffs are seeking overtime pay allegedly due them as employees of defendant under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., hereinafter also called the Wage and Hour Act. For convenience all plaintiffs will be referred to as "plaintiffs", and the defendants will be referred to collectively as "defendant". Defendant contends that Section 13(a) (4) of the Act exempts defendant and all its employees, including plaintiffs, from the Act's protection. Because a great number of plaintiffs seek recovery, the Court, after stipulation by the parties, has agreed to try initially the general issue, Does the exemption set forth in Section 13(a) (4) prevent each plaintiff from recovering? For the purposes of these proceedings, defendant concedes that, but for Section 13(a) (4), plaintiffs would be covered by the Act.

Defendant was incorporated in 1934 as an air carrier, and from that time until about January, 1942, it was exclusively engaged in operating a commercial airline from Chicago and the Twin Cities to the northwestern United States and to part of Canada. It maintained its own buildings, planes, and equipment, and employed many persons to care exclusively for its airline operations and property. But with the advent of war, defendant was requested by the United States Government to perform various projects necessary to the war effort. In January or early February, 1942, defendant was requested to, and did, establish and operate a military air transport route from the United States to Alaska. During the war, defendant flew supplies, equipment, and personnel over this route for the Government and for the Military Department. The operation was known as the "Northern Region Operation".

In February, 1942, the defendant was requested to, and did, begin modifying in St. Paul, Minnesota, army planes which were manufactured on the production lines of various companies and which, together with military planes from storage and parking fields, or from combat zones, were flown to defendant for various structural or mechanical changes, alterations, or additions in the planes or the military equipment thereon. This project permitted changes which experience and added knowledge showed were desirable, but which could not be incorporated with maximum production efficiency into the quantity production line procedures. Defendant had modified some of its own commercial planes prior to the war, so it had some experience in this particular line of work.

In June, 1942, the defendant also was requested, and agreed to carry on modification work in connection with the installation of certain aircraft instruments which were made in Minneapolis, and in September, 1942, defendant also established, at the Government's request, an ice research project in connection with the de-icing of propellers and wings. The evidence indicates that the defendant had been experimenting privately upon this problem prior to the war. Defendant also performed other war services, including the operation of a training school and flying troops and supplies

to foreign countries and between domestic airfields.

The plaintiffs in this proceeding were all employed upon the modification project. They were paid overtime under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., at the rate of time and one-half for all hours worked in excess of 48 hours per week. In this proceeding, they are seeking overtime under the Wage and Hour Act for the eight hours worked over 40 hours per week and for which they were not paid under the Railway Labor Act. They also seek an equal amount in liquidated damages under Section 16(b) of the Wage and Hour Act, 29 U.S.C.A. § 216(b).

Section 13 of the Wage and Hour Act provides: "Section 13(a). The provisions of sections 6 and 7 * * * shall not apply with respect to * * * (4) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act; * * *." 52 Stat. 1067, 29 U.S.C. A. § 213(a) (4).

■ Plaintiffs concede that this provision exempts defendant's commercial airline employees and activities from the Wage and Hour Act. But defendant argues (1) that Section 13(a) (4) exempts plaintiffs if defendant is subject to the Railway Labor Act with respect to any of its activities, including its airline activities, even if defendant is not subject to the Railway Act with respect to its modification activities, and (2) that the Railway Labor Act intends to subject a carrier to its jurisdiction for all purposes and all its activities if the carrier is subject to that Act for any activity at all. Defendant lastly urges that, in any event, the modification project actually was a part of, and so connected with, the airline activities that in fact the project was a carrier activity and therefore was covered by the Railway Labor Act. These three alternative contentions, which plaintiffs dispute, create the issues. The burden of proof is upon defendant, who urges the exemption. Walling v. De Soto Creamery & Produce Co., D.C.Minn.1943, 51 F.Supp. 938; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52.

Whether plaintiffs are exempt from the Wage and Hour Act upon the basis of defendant's first two contentions obviously depends upon the meaning of Section 13(a) (4) of the Wage and Hour Act and Sections 181–188 of 45 U.S.C.A., the latter sections being the Railway Labor Act applicable to air carriers.

■ Although defendant contends that the literal wording of Section 13(a) (4) supports its first contention, the section does not cover the problem specifically. That is, it states only that an employee of a carrier "subject" to the Railway Labor Act is exempt from the Wage and Hour Act. It does not state specifically if the exemption exists only when the Railway Labor Act applies to the specific activity or work in litigation, or if the exemption exists even when the Railway Labor Act is applicable only to other work or activities in which the employer is engaged as a carrier. Broadly and literally construed, the provision may sustain the latter meaning, as defendant contends. But it is well settled that the exemption provisions of the Wage and Hour Act must be construed strictly, not broadly, and that its remedial provisions must be construed liberally, so that the Act's words will accomplish the purpose at which the Act is aimed. Phillips Co. v. Walling, 1945, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876; Gemsco, Inc., v. Walling, 1944, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921. See also Walling v. Consumer Co., 7 Cir., 1945, 149 F.2d 626; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 1942, 113 F.2d 52.

■ The purpose of the Wage and Hour Act was to eliminate, not to perpetuate, substandard, undesirable labor conditions and their effect upon commerce. It sought to exclude from interstate commerce goods produced for commerce under conditions detrimental to standards of living necessary to the health and general well-being, and to prevent the use of interstate commerce as the means of spreading and perpetuating substandard labor conditions among the workers of the several states. United States v. Darby Lumber Co., 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. This was conceived by Congress to be a basic need of commerce, and it is the public policy which must be

considered when interpreting the meaning of the Act's provisions.

To accomplish this purpose, and to give heed to the public policy, Congress could not have intended that the exemption applied merely because the Railway Labor Act applied to another activity in which the company was engaged. As hereinafter noted, the Railway Labor Act does not apply merely because the company's other activities are subject to the Railway Labor Act. The activity in litigation must be subject to that Act in order for it to apply. So if defendant's broad construction were adopted, many employees would be denied protection of the Wage and Hour Act as well as the Railway Labor Act, and the conditions which the Wage and Hour Act sought to prevent would flourish with its sanction. No reason why companies which perform air carrier activities which are subject to the Railway Labor Act should be favored with respect to their non-carrier activities has been pointed out or is apparent. The Railway Labor Act does not require it. Nor does the purpose of the Wage and Hour Act permit it. And no basis for assuming that this proposed favoritism was the purpose for including Section 13(a) (4) in the Wage and Hour Act is apparent. On the contrary, the opposite is the fact. In Walling v. Rockton & Rion R. Co., D.C.S.C.1944, 54 Supp. 342, the trial court held with respect to Section 13(b) (2),[1] which defendant concedes is similar to and precedent for Section 13(a) (4), (54 F.Supp. at page 347): " * * * The language of Section 13(b) (2), as well as its legislative history, shows that the exemption was inserted to avoid duplication of Federal regulatory authority over the hours of employment of railroad workers. * * * Certainly it was not intended by this exemption to exclude a carrier not subject to regulation by the Interstate Commerce Commission."

This holding, together with the remainder of the trial court's decision, was promptly and summarily adopted by the Circuit Court of Appeals for the Fourth Circuit in their per curiam opinion. Walling v. Rockton & Rion R. Co., 1944, 146 F.2d 111. The same reasoning and conclusion adopted in that case also apply here to Section 13(a) (4). Its specific purpose, determined in the light of the Act in which it is found, its history, the public policy upon which it is founded, and the language of this section and the rest of the Act, considered together with the scope and meaning of the Railway Labor Act, to whose provisions it refers, permit only the conclusion that Section 13(a) (4) was intended by Congress to exempt employees of carriers to the extent to which the Railway Labor Act applied. Thereby the purposes of both the Wage and Hour Act and the Railway Labor Act would be accomplished, and their provisions, some of which relate to the same problems, will remain intact and their words reasonable in meaning and without contradiction.

Congress undoubtedly determined that public interest required that the benefits of the Railway Labor Act should be accorded the air transportation industry. The apparent success of the Act in bringing labor peace in rail transportation was at least one of the motivating reasons for the extension of the Act to the growing and vital national industry of air transportation. In passing Section 13(a) (4) of the Wage and Hour Act, Congress evidently intended to avoid any duplication or conflict of authority over the hours of employment of employees in the air transportation industry. For this reason, such employees were to be exempt from the Wage and Hour Act and jurisdiction over them was exclusively relegated to the Railway Labor Board. However, if any employee of an air carrier was not subject to the jurisdiction of the Railway Labor Act and its intent and purposes, then it must follow that there would be no conflict of Federal authority which Congress sought to avoid and the reasons for the exemption would be nonexistent. No cogent reason is advanced why the exemption could be extended beyond its aims and objects and beyond the apparent intent of Congress in its passage.

---

[1] Section 13(b) (2) provides that Section 7 of the Wage and Hour Act shall not apply to "any employee of an employer subject to the provisions of part I of the Interstate Commerce Act." 52 Stat. 1068, 29 U.S.C.A. § 213(b) (2).

A similar question arose in Walling v. Connecticut Co., 2 Cir., 154 F.2d 552. The decision in that case furnishes strong support for plaintiffs here and the conclusion just noted. In that case Section 13(a) (9) was considered by the appellate court. It provides that the provisions of Sections 6 and 7 of the Wage and Hour Act shall not apply to "any employee of a street, suburban, or interurban electric railway, or local trolley or motor bus carrier, not included in other exemptions contained in this section." Defendant operated electric trolley cars in New Haven, Connecticut, and its immediate vicinity and ran certain motor bus lines in and between several Connecticut cities. It also operated a power plant and produced and sold electric power. Some of the power produced was used by the defendant in the operation of its electric trolley cars, but a substantial amount was sold to a railroad for operation of interstate trains. In disposing of defendant's contention that, since it was a local trolley carrier and therefore its employees were exempt within Section 13(a) (9), each of its employees was exempt from the Wage and Hour Act regardless of the activities of the particular employee, the court stated (154 F.2d at page 553): " * * * Literally, that contention is correct. But it would mean that, no matter in what business, however extraneous to its functioning as a 'local trolley carrier,' defendant engaged, those employed in that extraneous business would be exempt. The policy of the Act disclosed in its history, precludes the acceptance of such a literal construction."

Defendant relies upon Brittan v. Hudson & Manhattan R. Co., D.C.N.Y., 50 F.Supp. 37. But it would seem that that decision is not sound and should not be followed. No reference is made by the court in that case to the rest of the Act or to its purpose, or to the need for a strict construction. The decision simply isolated the exemption and did not attempt to construe it as a part of the entire Act. It may be observed that the National Labor Relations Board, upon whose decision defendant relies, specifically declined to base its conclusion on the Brittan case when a matter closely related to the instant one was presented to it.[2] In re Northwest Airlines, Inc., et al., 51 N.L.R.B. 1012. The Circuit Court of Appeals for New York, the district from which the Brittan case came, has held unequivocally in Phillips v. Star Overall Dry Cleaning Laundry Co., 2 Cir., 1945, 149 F.2d 416, that exemptions should not be enlarged to the point of obstructing the attainment of the result which Congress sought to achieve by the Act, of which the exemption is a part. The Brittan decision permits and creates such an obstruction. In Nelson v. Agwilines, D.C., 70 F.Supp. 497, Judge Leibell commented upon the Brittan case and Anderson v. Southern Pacific Co., D.C., 62 F.Supp. 730 (in which the judge deciding the Brittan case indicated his approval of it). "Those cases," Judge Leibell said, "seem to apply the language of the exemption too literally." The opinion of the Chairman of the Railway Labor Board, upon which defendant also relies, only construes the Railway Labor Act; it does not purport to construe the Wage and Hour Act.[3]

Defendant's construction of the Railway Labor Act's coverage also must be rejected. That this Act never intended to embrace industries other than carrier activities and those things related to them

2 During the early part of the project's operation, the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, Local 134, C.I.O., petitioned the National Labor Relations Board to take jurisdiction over the modification employees, for whom the union sought to bargain. Defendant relied upon the Brittan case also in that proceeding, which is further discussed later in the opinion, to show that plaintiffs here were covered by the Railway Labor Act.

3 In early 1943, the defendant decided that it should function under the Wage and Hour Act with respect to its modification activities, and it requested permission to do so from the appropriate government agencies. But the Chairman of the Railway Labor Board concluded in May, 1943, that defendant was required to function under the Railway Labor Act. As a result of his conclusion, defendant continued to operate the project under the Railway Labor Act and to pay overtime only for hours worked in excess of 48 hours per week.

seems clear from the various provisions of the Act itself. Section 201 of the Act provides, 45 U.S.C.A. § 181: "All of the provisions of sections 151, 152, 154–163 of this title (Title I of the Interstate Commerce Act) are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce, and * * * every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service."

Section 182 extends to "said carriers by air and their employees" all the duties, requirements, penalties, benefits, and privileges prescribed by sections 151, 152, and 154–163 "to the same extent as though such carriers and their employees were specifically included within the definition of 'carrier' and 'employee', respectively, in section 151."

Section 151 provides:

"When used in this chapter * * * First. The term 'carrier' includes any express company, sleeping-car company, carrier by railroad, subject to chapter 1 of Title 49, and any company which is directly or indirectly owned or controlled by or under any common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, * * * and handling of property transported by railroad.

\* \* \* \* \* \*

"Fifth. The term 'employee' as used herein, includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect, * * *." 45 U.S.C.A. § 151.

Chapter 1, section 1, of Title 49 U.S.C.A. provides:

"The provisions of this chapter shall apply to common carriers engaged in—

"(a) The transportation of passengers or property wholly by railroad, * * *."

■ These sections govern the meaning of the Railway Labor Act here. They must be construed liberally. Because they are made relevant by an exemption which must be construed strictly does not mean that these provisions must be construed strictly. They are still part of a remedial statute (here the Railway Labor Act) and their application depends upon the usual scope of that remedial statute of which they are a part. Interstate Commerce Commission v. Jamestown Farmers Union Federated Co-op. Transp. Ass'n, 8 Cir., 1945, 151 F.2d 403, 404.

■ Taken together, reasonably read, these provisions, when read as a part of the statutes of which they are a part, appear to limit the application of the Railway Labor Act to carrier activities as such, and to those things which are related to them. Section 181 of 45 U.S.C.A. refers to "common carrier by air *engaged* in interstate or foreign commerce." It speaks only in terms of carriers and transportation activities. So do Section 151 and Chapter 1 of Title 49 U.S.C.A. If Congress had intended that non-carrier activities, and non-transportation activities should be covered by the Railway Labor Act, certainly it would not have referred only to carrier and transportation activities. For the Supreme Court has long held that merely because a company is a carrier for some purposes, it is not necessarily a carrier for all its activities. Kansas City Southern Ry. Co. v. United States, 282 U.S. 760, 51 S.Ct. 304, 75 L.Ed. 684. Congress must be presumed to have enacted Section 181 in the light of previous court decisions and to have used thoughtfully and meaningfully the words which it did.

That Congress did not intend that the coverage of the Railway Labor Act should be as broad as defendant urges is evident from Section 151 also. For it requires that even companies which are directly or indirectly owned and controlled, or under common control with a railroad must operate facilities or perform services in connection with transportation of property by railroad in order to be subject to the Railway Labor Act. If defendant's contention that a carrier subject to the Railway Labor Act for one purpose is subject to it with respect

to all its activities and for all purposes is sound, this express provision would not be needed in the Act. It would be surplusage.

■ Moreover, to adopt defendant's contention would add to the statute words which do not appear in it. The inference which defendant seeks to make is not a necessary one. If it were accepted, Congress, under the Railway Labor Act, would be entitled to control matters which were purely intra-state affairs. That Congress has no such power need hardly be reiterated. Defendant's interpretation creates an unnatural meaning which is contrary to the reasonable and natural meaning of the provisions. The purposes and history of the Railway Labor Act do not justify the interpretation which defendant seeks to read into the Act.

Defendant's contention has been rejected specifically by the National Labor Relations Board in a matter involving, among others, the parties to this litigation. In the Matter of Northwest Airlines, Inc., et al., 47 N.L.R.B. No. 69. The Board held: " * * * the decisions of other administrative agencies, as well as of the courts, are persuasive of the view that the terms 'carrier' and 'employee' as used in the Railway Labor Act are to be construed realistically. 2/ We therefore reject the foregoing argument of the Company, which would lead to the result that all activities of a concern are exempt from the provisions of the [National Labor Relations] Act if it operates to any extent, however incidental, as a carrier by air."

It has been rejected by numerous courts by inference and assumption of its unsoundness. The courts have looked to the relationship which the questioned activity bears to the interstate activities of a carrier as the test which determines the Railway Labor Act's applicability. They do not consider only if the Act is applicable to some other part of the company's business. See, for example, Virginian R. Co. v. System Federation, 1936, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Anderson v. Bigelow, 9 Cir., 1942, 130 F.2d 460; In the Matter of Hudson and Manhattan R. Co. Employees, 1941, 245 I.C.C. 415.

The Interstate Commerce Commission determined the question accurately in 245 I.C.C. at page 425. Applying the rules laid down by the United States Supreme Court in Virginian R. Co. v. System Federation, supra, the Commission declared unanimously on this point: "The reasonable conclusion from the court's pronouncement is that if the relation of the work of employees to the interstate activities of a carrier is remote, tenuous, and negligible, the Railway Labor Act does not apply to them."

The Commission looked to the work performed by the employees involved in that litigation. This test is reasonable and consonant with the evident purposes of Congress and should be applied to the present factual situation. The question, therefore, is presented, Was the relation of plaintiff's modification work to defendant's transportation work more than remote, tenuous, and negligible?

■ A detailed statement of facts seems necessary. The modification work continued from about February, 1942, until approximately the end of the war. Defendant was not the only company which modified bombers. Approximately nine other companies, including some aircraft manufacturers and other commercial airline companies, also engaged in bomber modification activities. The work which was to be performed on the planes varied. It included, at various times, installation of gas tanks, various brackets, armaments, radar equipment, bombsights, armor, gun mounts, etc., as well as test firing of guns, etc. The work to be done on each plane was determined in detail by the military officers, who relayed the information and order to defendant with respect to each bomber to be modified. Defendant directed the accomplishment of the work, and performed it. Army pilots, not defendant's, brought the planes to the base and took them from there to their next destination. Defendant took no title to the bombers.

When defendant commenced its modification activities, it did so pursuant to a letter of intent with respect to the planes then received. It had no specific contract at that time. Twenty bombers comprised the first

group, and the modification was done then, as at all times thereafter, at the Holman Municipal Airport (St. Paul) where, at that time, defendant maintained repair and overhaul shops for its own planes and also its general offices for the airlines. Defendant immediately assigned some of its own commercial airline workers to the modification work when the first group of planes arrived, and their work was supervised by defendant's regular supervisory staff. Defendant did, however, also hire additional help to aid in performing the work. For when the modification work commenced, defendant employed only about 900 persons on its entire system. About 200 of those employees were at St. Paul. And, because more planes continued to arrive at intervals thereafter for modification work, defendant continued to hire more help until, near the end of the war, between 5,500 and 6,000 persons were employed on modification work. Defendant elevated some of the mechanical help who had performed modification work on defendant's own planes before the war to supervisory jobs in modification work on bombers.

At first, defendant used its own raw materials, supplies, and equipment to perform the work. And the work was originally performed in defendant's hangar and outside, immediately adjacent to the hangar. But the project soon outgrew its quarters, and in approximately March, 1942, the Government began to obtain some materials for the work and commenced to investigate the availability of additional sheltered working space. Use of the Minnesota National Guard Air Squadron's hangar on the field was obtained. And in October and November, 1942, the Government began to construct, at its own expense, the two large hangars referred to as the "Riverside" hangars, with restaurant and other facilities. Upon their completion defendant performed some of its work in these buildings also. And small, special purpose hangars were constructed at government expense on the field so even more work could be carried on simultaneously.

Defendant did not maintain its commercial airline repair shops at the airport throughout the modification project's duration. Defendant moved its airline repair shops to another location in 1944. It had moved its general offices to another location prior to that time.

When the modification project commenced, and during part of its existence, some employees worked on defendant's engines as well as on modification work, as time permitted. And some Northern Region engine work was also done at the field. But after March, 1942, defendant turned over to the Government approximately nine of its sixteen commercial planes, thus reducing the time required to be spent on maintenance of defendant's own planes. And after defendant's airline shops were moved from the project, none of its commercial airline engine work appears to have been done there. The Northern Region work was also transferred to another location with the airline shops. In 1942 approximately $85,000 was spent by defendant for commercial airline engine work at the St. Paul Airport shops. In 1943 approximately $59,569 was spent for the same kind of work. And approximately $108,589 was spent for Northern Region engine overhaul at St. Paul in 1943. Defendant collected $41,000,000 from the Government for modification work performed from the beginning to the end of the project, exclusive of materials and fees for operating the project. Defendant was on a cost-plus-a-fee basis. Approximately 3,500 planes were modified at the project during its operation, and the work performed at the modification center was substantially the same after defendant's airline work was moved as before it moved. About September, 1942, defendant's commercial airline planes ceased to operate into the St. Paul Airport. The Army set up rigid protection rules for the project, and the rules were enforced. All employees who entered the project grounds, including commercial airline employees, needed identification badges. Guards were placed at strategic locations. Any airline engines defendant had repaired there were hauled there by truck. They were not flown in.

All the employees of the modification center originally were hired by defendant's supervisory employees, but subsequently a personnel department was established and hired all employees. The modifi-

510

cation employees were hired for modification work. The modification center employees, like those on other projects, were on the same payroll as defendant's commercial airline employees. Seniority rights prevailed throughout the company's activities, and many employees exercised those rights when transferring to or from another company branch, including the commercial airlines. The modification project employees were represented by the same union which represented the airlines employees.

At various periods, defendant attempted to segregate the airline and modification project costs, but it now contends that it was unable to do so accurately to its own satisfaction. At the present time, in fact, defendant claims an additional two million dollars from the Government as supervisory expenses which it contends it was unable to segregate with definiteness from its airline expenses because of the close relationship between the two projects. However, early in 1943 defendant did request permission from the Government to operate its modification center on a forty-hour week pursuant to the Wage and Hour Act begin-ning April 1, 1943, because it could segregate the project, including costs thereof, sufficiently from its other activities.

At the outset, it is clear that defendant's commercial airline operations were not dependent upon the modification project's continued activity. The project produced no parts or work which was required for or used for the airline operations. The project was created for, and related to, the nation's military needs, not to defendant's airline business. Defendant operated the project for the Government, and subject to the Government's instructions, not for itself, or in order to keep its planes in running order and to maintain its schedules. The installation of armor, or gun mounts, or gas tanks, or the making of structural changes in bombing planes, and the various other modifications on the bombers, and test firing of guns, had nothing to do with the operation of defendant's commercial airlines. Neither the work performed nor the bombers upon which it was performed were intended for use on defendant's air-lines, or to aid its operations. (Although some of the planes may have been used for some Northern Region work, the record does not seem sufficiently clear to justify a finding of the effect which that fact might have upon our problem here). They were for a purpose which was entirely separate and unrelated to the carrying on of defendant's airline business. They were to be used in war against foreign enemies. This was a war project, not something which pertained to carrying on an interstate transportation business. So it seems too clear for doubt that the actual work performed at the modification center on the bombers had no relation to the transportation activities of defendant. The only question is whether other factors present here create the relationship required under the Railway Labor Act to connect the modification activities with the airlines activities and thus to justify a finding that defendant performed the modification activities as a carrier. Careful consideration of the question requires a negative answer.

As the United States Supreme Court indicated in Virginian R. Co. v. System Federation, 1937, 300 U.S. 515, 57 S. Ct. 592, 81 L.Ed. 389, the test for determining the applicability of the Railway Labor Act is the relation of the *activity* (here the work on the bombers) to transportation. It is this relationship, not the relationship created by the bookkeeping and accounting and purchase and employment policies, which, when affected, causes the difficulties against which the Railway Labor Act guards. In that case the Supreme Court rejected the railroad's argument that, because the relationship between the work done and the railroad's transportation activities was caused by managerial policies, the relationship required by the Railway Labor Act did not exist. The court held very clearly that the situation which existed—the actual relationship between the disputed work and the transportation activities of the railroad—was the factor which determined the question. What different managerial policies or practices would or would not have done were disregarded by the court. Thus, as the Interstate Commerce Commission held in the Matter of Hudson & Manhattan R. Employees, 1941,

245 I.C.C. 415, in reliance upon the Virginian Railway Case, a distinction must be made between factors which show that it was an activity of the company, as such, and those which show that it was an activity of the company as a carrier. Therefore, as in the Hudson & Manhattan Railway Case before the commission, the fact that the employees were placed upon the same payroll as the carrier employees, could transfer from one branch of the company to another if there were jobs available in another branch, were hired by the same supervisory employees or personnel department as the airline employees, and also the fact that the modification and airline employees were represented by the same union, and wore the same type of overalls, and that the accounts of the modification center were difficult to separate from those of the airline operations seems to cut little, if any, figure here. They show only that the same company was carrying on both activities.

The fact that the accounts of the airlines and the modification center could not be separated with exact nicety may, at first glance, appear perplexing. But when it is remembered that the work performed on the bombers at the modification center was not necessary to defendant's airline activities or, so far as the evidence shows, even helpful to its operations as such, it becomes clear that the failure to segregate was due to the fact that the same type of materials was used in the modification work (bolts, metals, etc.) as in the airlines work, and because of the managerial and administrative policy of not separating the activities completely. Because the accounting practices and employment practices and production policies produced the most efficient operations for the company as a whole does not mean that the work at the modification center on the bombers was related to defendant's transportation activities in the required way. The materials used and the type of work may have been the same for modification activities and for the airline work. But the materials used, and sometimes furnished by defendant, and the tools used, and at first furnished by defendant, were not peculiar to airline carrier work. They were tools which could be used by airplane manufacturers and, in some instances, also by mechanical personnel of many types of business. In effect, defendant was engaged in the manufacturing business by this modification work. For it performed work which really was work required before the plane was completed or reconditioned for the purposes intended. Defendant really was a part of a scattered production line. Thus, the fact that a company which operated an airline and was thus a carrier with respect to the airlines work furnished tools, and materials, and also employees for the project and was unable to segregate the costs to its own satisfaction from the commercial airline expenses does not show here that the project receiving these materials and services was a part of the carrier activity. It seems, in view of the other facts, only that the project was being operated as a part of the defendant company not that it had any effect upon the carrier activities of defendant, or was a part of them.

Some modification employees did work at times on airline work. But recognition of the size of the modification project and the curtailed schedules of defendant after defendant turned over the majority of its planes to the Government in early 1942 and comparison of the cost of the work performed on modification and on commercial airlines planes would indicate that those employees were few in number, at least comparatively speaking. And after defendant moved its airline repair shops and offices from the modification site, it seems reasonable to conclude that little or no work was done at the modification project on any of defendant's commercial planes. And, in any event, merely because some of the employees worked on airline planes at various times does not mean that the bombers, or the work they performed upon the bombers, or the result of that work was necessary or related to defendant's air transportation work or that it had any effect upon the carrier activities. The work on the commercial planes was not a part of the employees' work on the bombers, and the work on the bombers was not a part of their work on the commercial planes. The work was separated and unrelated. The

end result achieved by the work was distinct from the other. It may be difficult to determine if the Wage and Hour Act or the Railway Labor Act applies, and when, to the employees who alternated between the commercial planes and the modification work. But that does not mean that when they were working on the bombers they were doing work related to and connected with defendant's transportation of passengers, mail, etc., on a commercial and interstate basis. After defendant moved its airline shops, the problem seems a nonexistent one on the record here. The relationship of the modification work to the airline operation, not the similarity of the types of work done, is what creates the required relationship.

■ The temporary nature of the project and the 'fact that it was necessitated by the war likewise seem immaterial here. Temporary workers and war workers were intended to, and throughout the war did, receive the same rights under the Wage and Hour Act and the Railway Labor Act as permanent peacetime workers.

■ The reason for not permitting accounting procedures and managerial and administrative practices to determine the Railway Labor Act's applicability seems clear. Mere "paper" manipulations are avoided, and the purpose of the Railway Labor Act preserved. The general rule is applicable here even if defendant's accounting procedures are not aimed at subjecting defendant only to the least burdensome laws. The difficulty defendant experienced in segregating the modification project costs accurately from the airline costs seems to lie in the manner in which the modification project developed, and the practical accounting problems which arose, not because of the effect which the modification project work had upon the transportation activities of defendant. And, in spite of what defendant's officers testified was a difficult accounting and segregation problem, it seems very significant that defendant was ready, and considered itself able, to segregate the modification employees from the airline employees as of April 1, 1943, and so informed the Army,

the Railway Labor Board, and others. This segregation which defendant considered itself able to do with reasonable accuracy in 1943, seems to show that the confusion of accounting between the project and the airlines does not go to the heart of the relationship between the two, and that the project and the airline work should not be considered as inseparable and related because of the confusion of accounting between the two.

■ In support of its present position that the Railway Act, not the Wage and Hour Act applies, defendant cites decisions by the National Labor Relations Board and an opinion by the Chairman of the Railway Labor Board[4] with respect to modification employees. The National Labor Relations Board recognized that the factual question was not without difficulty, and relied principally upon the premise that the Board would not interfere with the Railway Board's jurisdiction until the Railway Board had declined to take jurisdiction. In the Matter of Northwest Airlines, et al., 47 N.L.R.B. 69; 51 N.L.R.B. 1012. The opinion of the Railway Board's Chairman contains several premises and conclusions which raise a serious question as to the completeness of the consideration which was given the problem there. The opinion, which is in the form of a letter, contains the erroneous premise that Brittan v. Hudson & Manhattan R. Co., supra, determined that the employees involved there were within the Railway Labor Act. As previously noted, the case interpreted and applied only Section 13(a) (4) of the Wage and Hour Act. It did not decide the applicability of the Railway Labor Act. The Chairman also reasoned that the National Labor Relations Board had held the modification project within the Railway Labor Act and had refused to take jurisdiction. He overlooked that the National Labor Relations Board based its decision principally upon what the Board subsequently termed the "more important factor" (51 N.L.R.B. 1012) that the Railway Board had not yet decided if the Railway Labor Act applied. And, contrary to the Chairman's conclusion, the Brittan case did *not* reverse the Inter-

---

[4] See footnotes 2 and 3.

state Commerce Commission's decision with respect to the employees involved in that case. The Brittan case was an original proceeding, not an appeal, in the court. It was an entirely different case from the one before the Interstate Commerce Commission, although it did involve employees of the same railway. The issues were different. The Interstate Commerce Commission determined the applicability of the Railway Labor Act; the court determined the meaning of the Wage and Hour Act. The Interstate Commerce Commission and its decision were not mentioned in the court's opinion. Finally, the Chairman does not state, except very generally, why he considers the activities of the modification project within the provisions of the Railway Labor Act upon the facts.

Defendant contends that the Railway Labor Act was intended to prevent labor difficulties, and that if it is not applied here, then its purpose will not be accomplished with respect to the airline work, for a strike in the modification center would have affected and crippled the airlines. This argument is unsound. Among other reasons, the work of the modification center had no effect upon the airlines work as such. The transportation activities were not dependent upon the modification activities in any way to keep going. Because a strike in one branch of a company may create difficulty in another branch does not seem to require universal application of the Railway Labor Act. The difficulty arises because the same union represents both branches of one company, not because of the effect and relationship of the modification work to the airline activities. Under defendant's theory, the application of the Railway Labor Act would be almost unlimited. Because a strike occurs in one branch of a company does not necessarily mean that one will occur in another branch which is really unrelated to it, in so far as mechanical work is concerned.

In view of all the facts, these administrative decisions do not seem persuasive here. And, in any event, they are also opposed by opinions of the Wage and Hour Administrator and the Regional Director of the National War Labor Board. Upon the premises already noted, the modification project work upon the bombers does not bear the required relationship to the defendant's carrier work. The relationship is too remote, tenuous, and negligible, if it exists at all. Therefore, neither plaintiffs nor the modification work seem includable within the Railway Labor Act's provisions.

Plaintiffs seem entitled to the protection of the Wage and Hour Act. The relationship of their work to the carrier activities of defendant is too tenuous, negligible, and remote to be a part of them and to thereby be covered by the Railway Labor Act.

## Summary

### I.

(a). Section 13(a) (4) of the Fair Labor Standards Act, also called the Wage and Hour Act, 29 U.S.C.A. § 213(a) (4), exempts employees of carriers subject to the Railway Labor Act to the extent that the Railway Labor Act is applicable. It does not purport to exempt employees merely because the company by which they are employed is subject to the Railway Labor Act with respect to other activities in which it is engaged.

(b). The Railway Labor Act was intended to apply only to transportation activities and that work which bears more than a tenuous, negligible, and remote relationship to the transportation activities. It was not intended to apply to all work, regardless of its connection to transportation, merely because the company carrying on the work included carrier activities within its company functions.

### II.

Upon the facts presented, the modification activities of defendant and its employees at the modification project bear such a tenuous, negligible, and remote, if any, relationship to the air carrier transportation activities of defendant that they cannot be considered transportation activities covered by the Railway Labor Act.

## Conclusion

Section 13(a) (4) does not prevent plaintiffs from recovering. Plaintiffs are en-

titled to the protection of the Wage and Hour Act in so far as this exemption is concerned.

Findings of fact and conclusions of law in harmony herewith may be presented on five days' notice.

An exception is reserved to the defendant.