**JACKSON v. NORTHWEST AIRLINES, Inc., et al.**

**MURPHY et al. v. NORTHWEST AIR-LINES, Inc. (six cases).**

Civ. Nos. 760, 939, 949, 972, 982, 1005, 1024.

District Court, D. Minnesota, Third Division.

Oct. 9, 1947.

A. H. Markert and John A. Burns, both of St. Paul, Minn. for plaintiffs in Civ.A. No. 760.

Mark H. Gehan, of St. Paul, Minn. for plaintiffs in all actions except Civ.A.No. 760.

Charles S. Kidder, of St. Paul, Minn. (Orr, Stark & Kidder, of St. Paul, Minn., of counsel), for intervener in Civ.A.No.760.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

Michael J. Doherty and Pierce Butler, both of St. Paul, Minn. (Doherty, Rumble, Butler, Sullivan & Mitchell, of St. Paul, Minn., of counsel), for amicus curiæ, Air Transport Ass'n of America.

NORDBYE, District Judge.

The above proceedings are before the Court to determine the existence of interstate commerce and if plaintiffs were producing goods for interstate commerce within the meaning of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq.

Plaintiffs are seeking to recover for overtime pursuant to the provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., hereinafter sometimes called the Wage and Hour Act. This Court previously has determined that the plaintiffs are not exempted from the Act under Section 13(a) (4) thereof. Jackson et al. v. Northwest Airlines et al., D. C. 1947, 70 F.Supp. 501. But defendant now presses the question, Were plaintiffs engaged in commerce or in the production of goods for commerce? Defendant also disputes that it was, in law, the employer of these plaintiffs. After stipulation by the parties, the Court again has agreed to hear and determine these general issues in order to speed the final determination of these claims. Although the statement of facts heretofore made in 70 F.Supp. 501 is hereby incorporated herein by reference, the following facts permit a better understanding of the instant problem.

Defendant was incorporated in 1934 as a commercial air carrier, and from that time until January, 1942, it was engaged exclusively in operating a commercial airline from Chicago and the Twin Cities to the northwestern United States and to part of Canada. But with the advent of war, defendant was requested by the United States government to perform various projects necessary to the war effort. Pursuant to the Government's request, defendant in February, 1942, began modifying in St. Paul, Minnesota, army planes which were manufactured on the production lines of various companies and which, together with military planes from storage and parking fields, or from combat zones, were flown to defendant for various structural or mechanical changes, alterations, or additions in the planes or the military equipment thereon.

All the plaintiffs in this proceeding were employed on the modification project, although some of those whose cases are being determined by the instant decision performed mechanical work, some were guards, and some were janitors. Plaintiffs were paid overtime under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., at the rate of time and one-half for all hours worked in excess of 48 hours per week. In this proceeding they are seeking overtime under the Wage and Hour Act for the eight hours worked over 40 hours per week and for which they were not paid under the Railway Labor Act. They also seek an equal amount in liquidated damages under Section 16(b) of the Wage and Hour Act, 29 U.S.C.A. § 216(b). They contend that they were producing goods for commerce within the meaning of Section 7 of the Act.

Section 7(a) of the Act, 29 U.S.C.A. § 207(a), provides:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—
* * * * * *
"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Defendant contends that plaintiffs were not producing goods for commerce as required by Section 7 because (1) the planes were transported for war purposes by the Government and (2) the planes were produced for the ultimate consumer (the Government) and therefore were not "goods" in commerce within the meaning of the Wage and Hour Act. Defendant also contends that the Government, not defendant, was in law the employer of the plaintiffs. Section 3(d) provides: " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include th United States or any State * * *." These defenses raise the present issues of the instant proceedings. The following facts aid in their determination.

Defendant commenced its modification activities pursuant to a letter of intent from the Government with respect to the planes then received. It had no specific contract until later. The work was done at all times at Holman Municipal Airport (St. Paul) where, prior to the war, defendant maintained repair and overhaul shops for its own planes and also the general offices for the airlines. Defendant assigned some of its own commercial airlines workers to the modification work when the first planes arrived, and their work was supervised by defendant's regular supervisory staff. But as the bombers continued to arrive for modification, defendant required more help, and through its own facilities and activity, hired additional persons to work on the planes. When the modification project began, approximately 200 persons were employed in St. Paul, but when the project ceased, between 5,500 and 6,000 were employed on the project in defendant's name. Defendant elevated some of the mechanical help who had performed modification work on defendant's own planes before the war to supervisory jobs in modification work on bombers.

At first defendant used its own raw materials, supplies, and equipment to perform the work. And the work was originally performed in defendant's hangar and outside immediately adjacent to the hangar.

But the project's growth necessitated more space, and in early 1942 the Government began to obtain some materials for the work and to obtain more sheltered working space. Upon completion of the so-called "Riverside" hangars, which were constructed at government expense, the defendant performed some of the work in those hangars and also in the National Guard Air Squadron's Hangar, which had been obtained for the project's use. Small special purpose hangars also were constructed at government expense on the field so that even more work could be carried on simultaneously.

Defendant did not maintain its commercial airline repair shops at the airport throughout the modification project's duration. They were moved to another location in 1944. Its general offices were moved prior to that time. About September, 1942, defendant's commercial airlines planes ceased to operate into the St. Paul Airport.

When the modification project commenced, and during part of its existence, some employees worked on defendant's engines as well as on modification work, as time permitted. And after defendant's commercial airlines shops were moved from the project, none of its commercial airline engine work appears to have been done there. Defendant collected $41,000,000 from the Government for modification work performed from the beginning to the end of the project, exclusive of some materials and the fees for operating the project. Defendant was a cost-plus-a-fee contractor. The Government deposited money for its payroll, and other needs of the company, and this money was the money upon which defendant eventually drew. Approximately 3,500 bomber planes were modified at the project during its operation, and the work performed at the modification center was substantially the same after defendant's airline work was moved as before it moved. The Army set up rigid protection rules for the project, and the rules were enforced.

All the employees of the modification center originally were hired by defendant's supervisory employees, but subsequently a personnel department was established and hired all employees. The modification employees were hired for modification work. The modification center employees, like those on other projects, were on the same payroll as defendant's commercial airline employees. They were paid by Northwest Airlines checks. Seniority rights prevailed throughout the company's activities, and many employees exercised those rights by transferring to or from another company branch, including the commercial airlines. The modification project employees were represented by the same union which represented the airline employees. The book work for the modification project was handled along with the rest of the accounts of defendant by its regular office staff, supplemented according to the amount of work to be done.

At various times defendant attempted to segregate the airline and modification project costs, but contends that it was unable to do so accurately to its own satisfaction. The accounts of its commercial airlines and the project apparently were so merged and difficult to separate that they could not be separated accurately, in so far as defendant was concerned. The bombers were brought to and taken from the modification project by army pilots.

I. *Was Defendant or the United States Government the Plaintiffs' Employer in Law?*

Defendant, not the United States Government, was the employer of each plaintiff. Defendant was not the agent of the Government in the employee sense. It was an independent contractor. As noted in this Court's previous decision in this case (70 F.Supp. 501), defendant was, in effect, carrying on a manufacturing business, with respect to this plane modification project. It hired persons, including plaintiffs, to perform that work. It paid them from a payroll which ran in defendant's name. And when jobs were available in other branches of the defendant company, the modification employees could transfer to those branches. Such a right was in no way involved in the contracts between the Government and the defendant. Defendant's seniority policies which had been in effect prior to the project's existence continued, and were exercised by project employees with respect to other branches of

the company, including the commercial airlines. Defendant was the one who organized the project, and operated it in reality. In fact, the Government requested defendant to perform the services for the project because of its particular "know how" and experience in such activities. Defendant, not the Government, had direct and immediate control over the persons performing the work. Defendant, in effect, started the project by broadening its own modification activities, which was a private business on its own planes. But as the project grew, the need for more employees grew. At first defendant furnished its own materials and tools. And throughout the project the record shows that it was continually procuring at least some of them. And finally the large project over which this litigation developed resulted. So in reality, the project really was a gigantic enlargement of defendant's already existing activities and directed towards war rather than their commercial airline activities. When more employees were hired, defendant hired them in its usual manner. Defendant's commercial airlines office staff was enlarged to meet the need of the modification project. And the accounts of the two activities— commercial airlines and the modification project—were kept very closely tied together because of the difficulty in separating the accounts. Defendant's commercial airlines supervisory personnel were the supervisors with respect to plaintiffs and the employees on the project. Although some of the supervisory personnel subsequently hired may not have been drawn from the airlines staff, it seems clear that all the supervisors took their orders from the defendant, not the Government. The mere fact that the Government determined what work was to be done on the planes and inspected the planes after defendant completed the work on them is not important here. Anyone who hires another to perform work as an independent contractor states the work to be done, often in some detail. Defendant here was hired to perform the work set out by the Government, not to determine what work was to be done according to the military needs of the plane.

Plaintiffs were paid by defendant, and took their orders from defendant. The same union bargained for the modification center employees as bargained for defendant's other employees. So far as the record here shows, the defendant was not required to consult the Government when bargaining with its employees. The fact that the Government kept a deposit for the defendant on which the defendant might draw for the expenses of plaintiffs' salaries, and costs of the project, seems unpersuasive because it is of little, if any, probative value. This was only the procedure by which the Government paid the cost of the project which it hired defendant to undertake. It seems no different than if defendant put out its own money, as it often did, and was reimbursed from this fund. After all, every independent contractor is reimbursed for what he does in some manner or other and by some procedure. Often when the job is of a unit type, the period of payment is suspended until the unit of work is completed. Here, however, the project was a continuing one, and reimbursement after various periods, because of the amount of capital required, may not have been a convenient and practical one for the Government and defendant. Because they chose the procedure of depositing a sum on which defendant might draw as needed as the most convenient and practical means to pay for the work being done does not seem to indicate that defendant was an agent, and not an independent contractor in this situation. This was an unusual and an emergency situation necessitated by the war and therefore must be judged as such when determining if the deposit prevented defendant from being an independent contractor. That it did not seem very clear.

Under all the circumstances, as shown on the record, therefore, defendant, not the Government, was plaintiffs' employer. And defendant's contention that the Fair Labor Standards Act is inapplicable here because the Government was the employer is unsustainable and must be rejected. Other courts, interpreting similar war contracts, have held likewise. Bell v. Porter, 7 Cir., 1946, 159 F.2d 117, certiorari denied 67 S.Ct.

1092; Timberlake v. Day & Zimmerman, D.C.Iowa 1943, 49 F.Supp. 28, 31. See, also, State of Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615; Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9; Magann v. Long's Baggage & Transfer Co., D.C.Va. 1941, 39 F.Supp. 742.

II. *Were Plaintiffs Engaged in the Production of Goods for Commerce within the Meaning of the Fair Labor Standards Act?*

A. *Were the Planes in "Commerce"?*

■ Section 3(b) of the Fair Labor Standards Act provides: " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Neither this provision nor any other provision of the Fair Labor Standards Act declares that the United States Government cannot be engaged in "commerce" within the meaning and intent of that Act. And since the provision defines the term "commerce" broadly, and goes to the coverage of the Act, it must be construed liberally. So literally the provision includes transportation by the Government across state lines within the term "commerce", and the planes in question, according to the literal and plain interpretation of this provision, were in "commerce" under the Fair Labor Standards Act. Nothing in the Act implies a contrary meaning.

The cases defendant cites in support of its claim that, according to a rule of statutory construction, an exemption in favor of the Government must be implied are not in point here. Section 3(b) does not purport to determine, as did the statute in those cases, who is liable under, or restricted by, the Act. And, in any event, defendant, not the Government, is the one against whom these actions have been brought and who will be liable under this statute. No one is seeking to hold the Government liable under this Act. Any liability the Government may incur as a result of these proceedings results from a contract with defendant, not from the statute. Neither the cases defendant cites nor the policy upon which they are based purport to affect such a situation.

To do so here would cause the Fair Labor Standards Act to turn upon considerations other than the employer-employee relationship, as the Act clearly contemplates. Defendant must stand on its own feet in this litigation as a private employer. The Government is not present as an employer.

■ The defendant's claim that Section 3(b) is inapplicable, by implication, to government shipments and transportation is not supported by the fact that the Government is exempted from the "employer" definition. Because the Government is exempted from the definition of employer and is thereby exempted from liability under the Act (because liability under the Act turns on the "employer" status) does not mean that the Government's transportation activities cannot affect the liability of private persons under the Act. The question of employer and commerce are separate and different ones.

■■ The real question here is whether, in view of any aid for determining Congressional intent, Congress intended to grant by implication under the commerce definition of the Fair Labor Standards Act an exemption which would deny the protection and benefits of the Act to employees of private civilian employers who supplied goods to the Government. That Congress did not intend to exempt the Government's transportation of goods across state lines from "commerce" when such an exemption would deny the Act's protection to employees of private employers who supplied the Government seems clear from the purpose of the Act as well as from its literal wording.

This Act is a remedial act. Its purpose was to eliminate, not to perpetuate, substandard, undesirable labor conditions and their effect upon transportation across state lines. It sought to exclude from transportation across state lines the goods produced for commerce under conditions detrimental to standards of living which are necessary to the health and general well-being of the employees who produced the goods, and to prevent the use of transportation across state lines as the means of spreading and perpetuating sub-standard labor conditions among the workers of the

several States. United States v. Darby Lumber Co., 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. This was conceived by Congress to be a basic need of the Nation, and it is the public policy and need which must be kept in mind constantly when determining Congress' intent under the Act which was passed to accomplish this purpose. That this purpose would prompt Congress to include, rather than to exclude by silent indirection, employees of employers supplying the Government with goods seems free from doubt. The Government is a large purchaser and transporter of merchandise, and the accomplishment of the purpose of the Act would be hampered seriously if the employees of employers producing goods for the Government were not protected by the Act. It is just as detrimental to labor conditions, industrial peace, and standards of living if the Government transports goods produced under undesirable working conditions across state lines as when a private citizen effects such transportation.

Well-considered cases have reached the conclusion that Section 3(b) of the Act does not intend that transportation by the Government should deprive non-governmental employees, otherwise covered by the Act, from its protection. In Bell v. Porter, 7 Cir., 1947, 159 F.2d 117, 118, a unanimous court specifically held that "the production of goods for interstate transportation by or for the Government is production for commerce within the meaning of the Act." Timberlake v. Day & Zimmerman, D.C. Iowa 1943, 49 F.Supp. 28, 33, and Umthun v. Day & Zimmermann, 235 Iowa 293, 16 N.W.2d 258, reach the same conclusion. Roland v. United Airlines, Inc., D.C.Ill. 1947, 75 F.Supp. 25, specifically holds that bombing planes modified in one State and transported across state lines by the Government were in commerce and that the employees engaged in modifying them were producing goods for commerce. See, also, Clyde v. Broderick, 10 Cir., 1944, 144 F.2d 348, which holds that transportation of tools across state lines by private persons for the convenience of the Government was commerce, and Walling v. Patton–Tulley Transp. Co., 6 Cir., 1943, 134 F.2d 945. In the latter case, the court stated, 134 F.2d at page 949: " * * * The argument that it was the Congressional intention to make the Fair Labor Standards Act inapplicable to work under government contract, must be rejected. No reason appears why contractors for the government are to be permitted to maintain sub-standard labor conditions while private contractors are prohibited from so doing, and such view would thwart the clearly defined purpose of the Congress, particularly if applied at a time when all, or nearly all, major industries are operating upon government contract."

Magann v. Long's Baggage & Transfer Co., D.C.Va. 1941, 39 F.Supp. 742, holds that government transportation of the mails does not prevent the mails from being in "commerce" as between the employee who transports all the mail from the trains to the postal station, and his private employer who has a contract with the government to provide such transportation.

Defendant has cited several cases in opposition. Barksdale v. Ford, Bacon & Davis, D.C.Ark.1947, 70 F.Supp. 690, 691; Divins v. Hazeltine Electronics Corp., D.C., 70 F.Supp. 686, reversed in part 2 Cir., 1947, 163 F.2d 100; Kruger v. Los Angeles Shipbuilding & Drydock Corp. and Todd shipbuilding Corp., D.C., 74 F.Supp. 595; Stewart v. Kaiser Co., D.C.Or.1947, 71 F. Supp. 551; and Urban v. Victory Naval Uniform Co., D.C.Mass.1947, 71 F.Supp. 270. Undoubtedly these cases are contrary in some respects to the conclusion reached above with respect to this proceeding. But those cases approach the problem on the theory that the transportation activity is a governmental administrative act and therefore is not commerce, or else on the theory that the goods are war goods and therefore not in commerce. It seems more sound, however, to conclude that the rules of statutory construction and the broad intent and purpose with which Congress enacted the Fair Labor Standards Act require the view that Congress did not intend to exempt by indirection and silence the employees of private employers who perform services or furnish goods to the Government for use by it even if the Government transported the goods across state lines with its own personnel or under its own name, or

even if it intended to use the goods for war purposes. The administrative capacity in which the goods were transported herein may be assumed. But is not such transportation "commerce" as between plaintiffs and the defendant (employees and employer) in the instant situation within the meaning of the Fair Labor Standards Act? The one who transports the goods and its status in doing so has no necessary relation to the interstate activities of private employers and employees in view of the purposes of the Fair Labor Standards Act. Moreover, it is generally recognized that, as far as commerce is concerned, the one who owns the goods when transportation is effected is immaterial.

Commerce is indubitably necessary in the carrying on of a war. A country directing its entire industrial activities towards a successful prosecution of a global war must necessarily utilize the facilities of commerce in order to achieve its goal. And this is true whether the transportation is effected by the use of ordinary railroad or truck facilities carrying goods across state lines or effected by the Government's using its own personnel. If war is the antithesis of commerce when the Government owns or transports the goods which are ultimately destined for the war area, then it is likewise the antithesis of commerce when goods ultimately destined for the war area are shipped by a private producer or manufacturer. No good reason is suggested why commerce loses its identity as such in war times in an area where actual war is not being waged. The planes in question herein were not flown on any military missions directly from the St. Paul Airport. As far as the records indicate, they were flown to other airfields or training stations within the United States and remained there until further orders were given as to their ultimate destination. The mere fact that a war exists does not necessarily mean that the distinction between interstate commerce on the one hand, and transportation as a part of an actual military operation on the other, must be lost. Although the transportation of planes to and from the modification center was a part of the war effort, it does not follow that it was a part of a military operation so as to negate the exist-

ence of commerce. War is not necessarily the antithesis of the commerce which is carried on outside of the combat zone. If this were true, then all interstate activities, private and governmental, directed to the successful prosecution of the war would fall outside of the sphere of commerce. These planes which were modified were transported across state lines after leaving the manufacturers en route to St. Paul, and after modification by plaintiffs were transported across state lines before they were engaged in any actual military operations. It is difficult to differentiate as far as commerce is concerned between the movement of war materials across state lines and bomber planes flown across state lines. Neither will be devoted to the war effort until after their arrival at their ultimate destination. Until that time they are in commerce within the Fair Labor Standards Act and the constitutional conception of the term as realistically as the transportation of any other goods across state lines.

■ It should be emphasized that commerce is not, under the Constitution, confined to trade and commercial transactions. It includes transportation of one's own goods from State to State, the movement of people across state lines, the transportation of a stolen automobile from one State to another, the transportation of women across state lines for immoral purposes, and many other types of transportation which have no relation whatsoever to the ordinary conception of trade or competitive commercial transactions.

■■ The above views may seem contrary to those expressed by the Second Circuit in Divins v. Hazeltine Electronics Corp., supra, but there the court considered the equipment on, and repair of, vessels of war whose immediate transportation thereafter was to be in waters of actual combat. That situation may be distinguished from transportation of bomber planes which were to be transported in peaceful areas of commerce across state lines before they were to be flown into actual combat. As the warships in the Divins case left the port after the repairing equipment was installed, they were in reality immediately in combat waters. The purpose of leaving the United States was to engage

in actual warfare. This cannot be said of the planes which were flown from the St. Paul Airport to other airfields, training stations, etc., within the borders of this country. As far as the record herein indicates, the bomber planes after modification may have remained in this country for an indefinite period before they were flown to any combat zone. And in referring to the Divins case it may be pointed out that the court held that the [163 F.2d 102] "armed cargo transports" and "armed transports" were in commerce "even though the goods or persons they transport will be devoted to the war effort after arrival at destination." The fact that these vessels traveled in the waters which were within the war area, carrying war goods in government owned ships and manned by government personnel did not bring such transportation outside the term "commerce" as used in the Act. Surely, the movement of cargo ships by the Government under such circumstances must be recognized as an administrative act of the Government, but that question was not even discussed by the court. The result, however, in the Divins case, in so far as the installation of equipment on armed cargo ships being the production of goods for commerce is concerned, must be considered as directly contrary to the views of the court in Barksdale v. Ford, Bacon & Davis, supra, and the cases cited therein.

Under these premises, therefore, the reasons and cases advanced by defendant for the proposition that plaintiffs were not producing goods for "commerce" must be rejected. Under the literal wording of the Fair Labor Standards Act and as that Act is construed in the light of the purpose of its enactment and the other aids of construction and interpretation, the planes involved herein were "in commerce".

B. *Were Plaintiffs Producing "Goods"?*

Section 3(i) of the Fair Labor Standards Act provides: " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, *but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."* (Italics supplied.)

The italicized portion of the quotation raises the question to be discussed. It is plain that the planes were articles. The conclusion in the above discussion establishes that they were in "commerce" within the meaning of the Fair Labor Standards Act. Therefore, they were "goods" for "commerce" unless the italicized exclusionary part of the above definition applies. .

Defendant contends that since the Government was the ultimate consumer of the planes and owned the planes while they were at the modification center in St. Paul, the provision applies. But these facts do not aid defendant. The defendant, not the Government, was the employer. And when the planes were at the St. Paul Airport with work being done upon them, defendant, not the Government, had actual physical possession of the planes for the purposes of accomplishing the necessary work. The parts put on the planes were in the defendant's actual possession as an employer, not in the Government's actual possession. Because someone other than the defendant had title to the goods is immaterial. Hamlet Ice Co. v. Fleming, 4 Cir., 127 F.2d 165, certiorari denied 317 U.S. 634, 63 S.Ct. 29, 87 L.Ed. 511.

The exception, by its plain words, does not apply until *after* the article is delivered to the ultimate consumer. Consequently, since the production upon these planes by plaintiffs occurred *before* the delivery, the planes were not within the exception at the time the work was performed upon them. That the application of the exception must be determined as of the time the work is done seems clear, for the practical necessities of business management and labor relations require it. Too often articles are not immediately sold, and wages become due the employees who produced the article before it is sold. Moreover, as Judge Russell declared in Fleming v. Atlantic Co., D.C.Ga.1941, 40 F.Supp. 654, at page 662, affirmed 5 Cir., 1942, 131 F.2d 518: "Production of goods presupposes acts and employment prior to any delivery, and there can be no reasonable construction of the statute which would relate the condition

of goods after delivery to production. Goods cannot be produced after they are in the actual physical possession of the ultimate consumer. Statement of this term of the statute, with the exclusion appended, discloses the unreasonableness of such construction. Thus, 'every employer shall pay to each of his employees engaged in the production of goods, but not including goods after their delivery into the actual physical possession of the ultimate consumer thereof,' makes no sense at all, for as above stated the production aimed at by the Act must precede the delivery." See, also, Gordon v. Paducah Ice Mfg. Co., D. C., 41 F.Supp. 980.

The instant situation seems analogous to the situation in which an ice company produces ice for, and ices, railroad refrigerator cars which are to be transported out of the State. For here, as there, the goods produced cross the state lines after delivery to the ultimate consumer, there the railroad. In those cases, the courts hold that the persons producing the ice are producing "goods" for commerce. Gordon v. Paducah Ice Mfg. Co., supra; Fleming v. Atlantic Co., supra. Inasmuch as the employer need only *expect* the article to be transported in commerce in order for the employee to be producing goods for commerce, the fact of delivery to the ultimate consumer (here the Government) prior to the crossing of state lines seems immaterial. And for the reasons noted in the above discussion concerning the "commerce" and the "employer" questions, the fact that the Government owned the airplanes and perhaps the materials and was the recipient of the plane is not here important.

Moreover, it seems important to note that the work of which the Government was the ultimate consumer, in so far as this decision and these plaintiffs and defendant are concerned, was the work performed by the defendant's employees, not the work which had been performed by the airplane companies' employees prior to the delivery of the planes to St. Paul. The work of defendant's employees was of a manufacturing nature, and the Government obviously could not have actual possession of the work or its result until after it was finished. This was not recognized in the Barksdale case and the other cases relied upon by defendant. Obviously, defendant and its employees had the actual possession of the materials while the work was being done, and therefore of the production carried on, regardless of who owned the materials.

It also seems desirable to note that defendant, who is raising this defense, was not itself the ultimate consumer, for it was the manufacturer or producer or processor with respect to the plane. The action is against defendant, and defendant, as an employer, is the one who under the Act must or must not be liable. It is that liability under the Act which is important, not the liability of the Government under the contract with defendant. Defendant's attempt to rely upon the Government's status is unsound for the same reasons noted under "commerce" even if the Government is an ultimate consumer of the airplanes which plaintiffs and the rest of defendant's employees produced or as to the production of which they were necessary. Because the exemption was made for the benefit of the ultimate consumer, the defendant, who under the Act is not an ultimate consumer, does not seem entitled to rely upon it.

Moreover the Circuit Court of Appeals decision in Divins v. Hazeltine Electronics Corp., supra, holds in the last paragraph of the opinion, with respect to the "ultimate consumer" question under Section 3(i), that in order to be an ultimate consumer of goods under construction within the meaning of Section 3(i) of the Fair Labor Standards Act, the consumer must not put them in commerce after their completion. The airplanes in question here were in commerce after their completion by defendant and were intended to be when the work was performed upon them. Therefore, under the Divins case, defendant was not an ultimate consumer. The Second Circuit Court of Appeals said in the Divins case: "When goods are delivered to the ultimate consumer they are withdrawn from commerce and from the coverage of the Act unless the ultimate consumer is himself a producer, manufac-

42

turer or processor of them. * * * The United States was the ultimate consumer of the equipment upon which plaintiffs worked, and since the warships on which the equipment was installed were not instruments of commerce, the United States was not a producer, manufacturer, or processor of the equipment in causing work to be done upon it. * * * An opposite result, however, is required with respect to installation of equipment on ships in process of construction which were instruments of commerce, such as armed cargo transports."

In view of these premises, therefore, defendant's reliance upon Section 3(i) of the Wage and Hour Act does not aid it. Its contentions with respect to it are unsound. The exception does not apply.

Therefore, upon the basis of the above discussion, plaintiffs, as they contend, were producing goods for commerce within the meaning of the Fair Labor Standards Act when they were employed on the modification project operated by defendant.

■ This conclusion assumedly is contra to that reached in Anderson v. Federal Cartridge Corporation, D.C., 72 F.Supp. 644, by Judge Vogel, acting by assignment in this Court. But because one of the counsel in the Federal Cartridge case has informed the Court that an appeal in that case is contemplated, and because counsel for both sides in the instant cases intend to appeal the instant question in so far as it is adverse to their clients, this Court believes that the basic policy which dictates that decisions at least from the same district should be consistent may be suspended: Precedent from the same district should not be binding necessarily if both the counsel for the case establishing that precedent and the counsel for the case to which the precedent is sought to be applied intend to appeal the decisions promptly and directly to a higher court.

Under all the circumstances, plaintiffs are entitled to recover under the Fair Labor Standards Act for the hours worked on the modification project and for which they did not receive compensation in accordance with the Act. It is so ordered.

Findings of fact and conclusions of law consistent herewith may be presented upon five days' notice.

An exception is allowed to each and every aggrieved party.