**JACKSON v. NORTHWEST AIRLINES,**
Inc., et al. and six other cases.

Civ. Nos. 760, 939, 949, 972, 982, 1005, 1024.

District Court, D. Minnesota, Third Division.

Feb. 9, 1948.

Elmer J. Ryan, of South St. Paul, Minn., for plaintiffs in all actions.

A. H. Markert and John A. Burns, both of St. Paul, Minn., for plaintiffs in Civil Action No. 760.

Mark H. Gehan, of St. Paul, Minn., for plaintiffs in all actions except Civil Action No. 760.

Charles S. Kidder, of St. Paul, Minn. (Orr, Stark & Kidder, of St. Paul, Minn., of counsel), for intervener Ray R. Brown in Civil Action No. 760.

Douglas Hall, Wyman Smith and Kenneth J. Enkel, all of Minneapolis, Minn., for Wilbur H. Theilmann, and others, interveners.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

Pierce Butler, of St. Paul, Minn. (Doherty, Rumble, Butler, Sullivan & Mitchell, of St. Paul, Minn., of counsel), for amicus curiae, Air Transport Ass'n of America.

NORDBYE, District Judge.

These actions are for overtime wages and are based upon the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. They are before the Court for determination of the question, Do Sections 9 and 11 of the Portal-to-Portal Act of 1947, 80th Congress, 1st Session, Chapter 52, Public Law 49, prevent plaintiffs from recovering?

Plaintiffs were employed at a bomber modification project operated by defendant for the Government during the war. This Court previously has determined that Section 13(a) (4) of the Fair Labor Standards Act, sometimes called the Wage and Hour Act, does not exempt plaintiffs employed on the modification project from the Act's protection, Jackson v. Northwest Airlines, D.C., 1947, 70 F.Supp. 501, and also that plaintiffs were producing goods for commerce or were engaged in commerce within the meaning of the Wage and Hour Act while working at the modification project, Jackson v. Northwest Airlines, D. C., 1947, 75 F.Supp. 32. The instant questions, like the others already decided, are general ones and are being determined by the Court now because of a stipulation made by the parties in order to speed the final determination of these claims. The statements of facts made by this Court in its previous decisions concerning these actions are hereby incorporated herein by reference.

Section 9 of the Portal-to-Portal Act of 1947 provides: "Reliance on past administrative rulings, etc. In any action or pro-

ceeding commenced prior to or on or after the date of the enactment of this Act based on any act or omission prior to the date of the enactment of this Act, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, * * * if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect."

Section 11 of the same Act provides: "Liquidated damages. In any action commenced prior to or on or after the date of the enactment of this Act to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16(b) of such Act."

Two main issues are raised with respect to these actions. First: Do Sections 9 and 11 apply to the facts of these actions? Second: If Sections 9 and 11 are applicable here, do they violate the Federal Constitution? To determine these issues certain details not emphasized in the previous decisions in these actions must be understood.

Defendant was a cost-plus-a-fee contractor with respect to the modification project.

The labor costs, including the wages of plaintiffs herein, were a part of the costs and were paid out of government funds. The project commenced in early 1942. Although it mushroomed quickly, it commenced on a comparatively small scale. The uncontradicted testimony is that no one was certain at first if the modification work was temporary or permanent. The original work was done through letters of intent from the Government. No formal contract was signed until later. Because defendant was a commercial airlines, it was subject to the jurisdiction of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., with respect to its airlines activities. And when its shop work and modification activities with respect to its own planes were expanded to bomber planes, it continued to operate the modification project in accordance with the Railway Labor Act.

On February 13, 1943, approximately one year after the project commenced, the National Labor Relations Board rendered a decision in which it denied the petition of a U.A.W.-C.I.O. local which requested the Board to take jurisdiction over the modification employees. The Board held that the airlines and the modification project was subject to the Railway Labor Act and therefore was exempt from the National Labor Relations Act because of Section 2(a) thereof, 29 U.S.C.A. § 152(a). The Board also declared that because of that exemption the Board should not seek to exercise its prerogative until the National Mediation Board clearly declined jurisdiction under the Railway Labor Act.

On February 26, 1943, the Administrator of the Wage and Hour Division of the United States Department of Labor wrote an "outline" of "my position on the interpretation of the section 13(a) (4) exemption of the Fair Labor Standards Act." He declared, "Thus, reading the activities specified in the War Department contract under 'Statement of Services' section (a) (1) and (a) (2) (aa) through (jj) as limiting the activities to be carried on under the contract rather than as being merely illustrative as provided in section (a) (2) thereof, and provided such activities in fact bear a reasonably close relationship to air transport activities, the provisions of the sec-

124

tion 13(a) (4) exemption will be applied by the Wage and Hour Division to employees engaged therein."

He also stated, "I think it is significant that the National Labor Relations Board in its decision In the Matter of Northwest Airlines, Inc., to which you referred in your letter of February 15, specifically rejected the theory that the provisions of Title II of the Railway Labor Act should be applied to any employees whose employer engages, no matter how incidentally, in operations as a carrier by air. * * * I believe that I should be guided by the views expressed by the Labor Board in its decision."

On March 2, 1943, and April 6, 1943, the defendant's secretary wrote the Air Corps on behalf of defendant, and stated that, in view of the Administrator's letter, defendant's modification activities appeared exempt under Section 13(a) (4) of the Wage and Hour Act. But he also requested assurance that the defendant would be reimbursed by the Government for any liability which might be incurred by defendant under the Wage and Hour Act. About that time some of defendant's modification employees had commenced actions for wages allegedly due under the Wage and Hour Act.

On March 11, 1943, the Railway Labor Panel Chairman approved pay schedules for certain modification project employees.

But notwithstanding the views expressed by the National Labor Relations Board and the Administrator of the Wage and Hour Act, defendant probably believed that the question was close, and in order to bring about a better relation with its employees and to increase the productive capacity of the project, decided to operate under the Wage and Hour Act and so informed the contracting officer of the Army Air Corps. On April 19, 1943, the Chief of the Army Air Corps Procurement Division wrote defendant's secretary in response to his inquiries, and after some conferences, stating: "You have advised this office that the relation of the work performed by employees at the St. Paul Center to your air carrier activities has changed, and that your Company has established, as of April 1, 1943, definite procedures to effect a separa-

tion of operations. You have advised this office that, subject to the approval of the Contracting Officer, your Company proposed to proceed, as of April 1, 1943, on the basis of a 40 hour week at the St. Paul Modification Center and that it is anticipated that this action will have a beneficial effect on the relations with your employees engaged in Modification Center work and should increase the productive capacity of the Center."

The defendant was informed by the Army Air Corps that overtime paid in accordance with the Wage and Hour Act would be an allowable item of cost under the contract. Accordingly, a notice to employees was posted at the project stating that, subject to a contrary ruling by a government agency or a change in the statutes, the Modification Center would function under the Fair Labor Standards Act as soon as appropriate permission was obtained. And on April 30, 1943, defendant, through its Director of Labor Relations, inquired of the National War Labor Board if Board approval was required in order for defendant to adopt a forty-hour week with time and one-half for overtime over forty hours. The inquiry stated that changes in methods of production and operation had occurred, and that "We are advised that these changes in methods of production have brought such activities within the ambit of the Wage and Hour Act." The Board's answer permitted the change-over to the Wage and Hour Act.

However, on May 4, 1943, one of defendant's officers conferred with William M. Leiserson, Chairman of the National Railway Labor Panel concerning the change-over to the Wage and Hour Act. As a result of that conference, letters were exchanged on that day by defendant's officer, Linus C. Glotzbach, and Chairman Leiserson. Chairman Leiserson informed defendant that the modification center was "covered by the Railway Labor Act" and that "the proposed payment of time and one-half for overtime after forty hours cannot be approved."

Defendant then informed the Air Corps of Chairman Leiserson's ruling. And on May 10, 1943, an Air Corps Contracting Officer wrote defendant that its modification center could operate on a forty-eight

hour week and that the Government would assume liability for any judgments resulting from successful actions under the Wage and Hour Act.

The notice informing defendant's employees that the federal authorities had refused to permit the modification center to function on a forty-hour week, with time and one-half for overtime after forty hours, and that "accordingly", defendant would continue to operate the project "on the basis of a forty-eight hour week, with straight time", was posted May 17, 1943.

Defendant operated the project under the Railway Labor Act thereafter until the project closed. And during the remainder of the project's existence little other correspondence was carried on between defendant and the ones to whom it had already written. On March 5, 1945, defendant's secretary inquired of the Department of Labor if defendant was subject to Executive Order No. 9240, 40 U.S.C.A § 326 note. On March 9, 1945, a Special Assistant to the Secretary of Labor notified defendant that it was subject to that Order. The Order involved premium pay. But that position was reversed on June 1, 1945, after receipt of a brief from defendant in which defendant explained that the relationship between the modification center work and the airlines activities was close, and not unrelated as the Special Assistant had first concluded upon the facts furnished him.

On March 29, 1945, defendant's president requested the Air Force Procurement Division to "affirm the instructions and guarantees contained in your letter of May 10, 1943", because defendant planned to bring about almost complete operational and physical separation of its bomber modification and airline activities. A letter affirming the "instruction" that defendant's employees should be paid according to the Railway Labor Act, and that if so paid the Government would reimburse defendant for liabilities incurred as a result of that practice, was written to defendant by the Air Force on March 31, 1945.

■■ Upon these facts the general issues turn. At the outset, the relationship between the Fair Labor Standards Act and the Portal-to-Portal Act of 1947, and the effect of the Portal-to-Portal Act upon the Fair Labor Standards Act, must be determined and clearly understood. The Portal-to-Portal Act does not purport to amend or repeal any part of the Wage and Hour Act by its express terms. A reading of the Portal-to-Portal Act shows that it supplements the Wage and Hour Act, and by its very nature and terms must be read as a part of it. In effect, although not in name, it is an amendment. It limits the Fair Labor Standards Act operation in some instances and changes its interpreted meaning by clarifying the Act's meaning in other instances. But, as pointed out by the Wage and Hour Administrator in his Interpretative Bulletin issued in November, 1947, the Portal-to-Portal Act nowhere purports to change or restrict the purposes and objectives of the Fair Labor Standards Act. Those purposes and objectives still remain. 29 Code of Regulations, Chapter V, Part 790, Section 790.2. Consequently, Sections 9 and 11, like the remainder of the Portal-to-Portal Act, must be interpreted and applied with that fact in mind and with a view to effectuating the purpose and intent of the Portal-to-Portal Act without destroying the objectives and purpose to which it subscribes.

I. Does Section 9 of the Portal-to-Portal Act Prevent Recovery?

■ Section 9 requires by its specific terms that defendant must plead and prove that the omission to pay plaintiffs according to the Fair Labor Standards Act was (1) in good faith (2) in conformity with and (3) in reliance upon (4) any administrative regulation, order, ruling, approval or interpretation of any agency of the United States or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Thus, the burden of proof is placed specifically upon defendant, and that burden must be sustained by defendant with respect to each of the four requirements.

The detailed facts stated above present the history which is relevant under Section 9. That history shows that no ruling, order, interpretation, or approval or regulation was made with respect to the modification

project until the National Labor Relations Board's ruling of February 13, 1943. Obviously, no reliance upon a ruling of an administrative agency can exist prior to the existence of a ruling, regulation, order, etc. Consequently, defendant cannot, and apparently does not, claim any benefits from Section 9 prior to the date of the National Labor Relations Board's first ruling that its modification employees were subject to the Railway Labor Act. In fact, defendant apparently claims no rights under Section 9 until May 4, 1943, when the Chairman of the National Railway Labor Panel advised defendant that, in his opinion, defendant's modification project was subject to the Railway Labor Act and that defendant could not pay its employees pursuant to the Fair Labor Standards Act. The record here shows that such a concession is in accord with the facts, for the Army Air Force letter to defendant on April 19, 1943, informing it that defendant could operate under the Wage and Hour Act and that overtime paid thereunder would be an allowable item of cost under the contract, and defendant's action thereon as shown by its notice to its employees that the project would operate under the Wage and Hour Act after April 1, 1943, if the proper permission could be obtained, clearly shows that defendant could not and did not seek to act either in conformity with or in reliance on the National Labor Relations Board's order. Consequently, the exemption provided by Section 9 cannot be applied under any circumstances until at least May 4, 1943.

That defendant acted in conformity with, and in reliance on the opinion which the Chairman of the Railway Labor Panel rendered on May 4, 1943, seems clear from doubt. Defendant's notice of May 17, 1943, informing its employees that the appropriate authorities did not approve the increase and that therefore the project could not go under the Wage and Hour Act unequivocally establishes that the airlines was relying upon the positions of those whom it mentioned in the notice.[1] Defendant had requested Chairman Leiserson and the contracting officer of the Army Air Corps for instructions concerning the project's Wage and Hour Act operations because defendant apparently considered that such approval and instructions were necessary before the change-over from the Railway Labor Act to the Wage and Hour Act could be accomplished. It clearly appears, therefore, that defendant acted as it did after May 4, 1943, solely in reliance upon the views of Chairman Leiserson and the consent of the Army Air Corps when it concluded to abandon its intention to operate under the Wage and Hour Act.

But these facts do not entitle defendant to the benefits of Section 9. This section

---

[1] "Notice

"On April 30, 1943, a notice was posted at the St. Paul Modification Center stating that, on and after April 1, 1943, with the permission of the War Department and subject to approval of the proper Federal authorities, employees of the Modification Center, with the exception of supervisory employees, would receive time and one-half for all time in excess of forty hours per week or in excess of eight hours per day and that our existing contract with the Air Line Mechanics Association, International, was in the process of adjustment. Our present contract with the Air Line Mechanics Association, International, had been approved by the National Railway Labor Panel and accordingly authorization was requested of the Chairman of the National Railway Labor Panel, to pay our ( ployees at the Modification Center, with the exception of supervisory employees, time and one-half for time in excess of forty hours per week or in excess of eight hours per day. The Chairman of the National Railway Labor Panel claimed and exercised jurisdiction of all of our employees and, referring to Executive Orders of the President, denied our request. Thereafter, the War Department withdrew its authorization permitting Northwest Airlines, Inc., to operate on a forty-hour week and pay time and one-half for overtime in excess of forty hours per week and in excess of eight hours per day and notified Northwest Airlines, Inc., for the time being to continue to pay its employees as in the past and as of prior to April 1, 1943, on the basis of a forty-eight hour week, straight time. Accordingly, our employees at the Modification Center will continue for the time being to receive pay as in the past and as of prior to April 1, 1943, on the basis of a forty-eight hour week, straight time.

"Dated at St. Paul, Minnesota,
"May 17, 1943.
Northwest Airlines, Inc."

specifically requires that the administrative regulation, order, ruling, approval, or interpretation upon which the employer acts in reliance and to which he conforms by his actions must be that of an "agency of the United States." The Wage and Hour Act Administrator has stated what constitutes an "agency" in his Interpretative Bulletin concerning the Portal-to-Portal Act of 1947. 29 Code of Regulations, Chapter V, Part 790, Section 790.19, issued November, 1947. He states (with footnotes here omitted): "(b) The Portal Act contains no comprehensive definition of 'agency' as used in sections 9 and 10, but an indication of the meaning intended by Congress may be found in section 10. In that section, where the 'agency' whose regulations, order, ruling, approval, interpretation, administrative practice or enforcement policy may be relied on is confined to 'the agency of the United States' specified in the section, the Act expressly limits the meaning of the term to the official or officials actually vested with final authority under the statutes involved. Similarly, the definitions of 'agency' in other Federal statutes indicate that the term has customarily been restricted in its usage by Congress to the persons vested under the statutes with the real power to act for the Government—those who actually have the power to act as (rather than merely for) the highest administrative authority of the Government establishment. Futhermore, it appears from the statement of the managers on the part of the House, accompanying the Conference Committee Report, that the term 'agency' as appearing in the Portal Act was employed in this sense. As there stated, (p. 16) the regulations, orders, rulings, approvals, interpretations, administrative practices, and enforcement policies relied upon and conformed with must be those of an 'agency' and not of an individual officer or employee of the agency."

The Railway Labor Panel was created by Excutive Order No. 9172, May 22, 1942, 7 Fed. Reg. 3913. It creates a "National Railway Labor Panel of nine members, hereinafter referred to as the Panel, to be appointed by the President * * *." Executive Order No. 9299, dated February 4, 1943, Notes foll. 45 U.S.C.A. § 156, 8 Fed. Reg. 1669, provides in the parts relevant here:

"2. No carrier shall make any change in wage rates * * * unless notice of such proposed change shall have been filed with the Chairman of the National Railway Labor Panel, created by Executive Order No. 9172, and shall have been permitted to become effective as hereinafter provided.

\*    \*    \*    \*    \*    \*

"3. If the Chairman of the National Railway Labor Panel has reason to believe that the proposed change, in wage rates or salary, may not conform to the standards prescribed in Executive Order No. 9250, or to the general stabilization program made effective thereunder, or to the directives on policy issued by the Economic Stabilization Director thereunder and the proposed change is not modified to conform to such standards, program, and directives, he shall designate three members of the Panel as an Emergency Board to investigate the proposed change and to report to the President. Otherwise, the Chairman of the Panel may permit the proposed change to become effective."

By Section 5 of the Executive Order 9299, copies of the Emergency Board's report must be filed with the Economic Stabilization Director, among others. And "Unless and except to the extent that the Economic Stabilization Director shall otherwise direct, the recommendation of the Emergency Board in regard to the proposed changes affecting wages and salary payments shall, upon the expiration of thirty days after the report is filed with the President, become operative."

From this order it is clear that, with respect to the denial of wage adjustments, the Emergency Board designated by the Chairman of the Railway Labor Panel, not the Chairman, was intended to possess the administrative authority, and that therefore the Emergency Boards were the "agency of the United States" contemplated by Section 9 of the Portal-to-Portal Act for this situation. The Chairman of the Panel had no right or power to speak as the agency with respect to denial of wage adjustments. The mere fact that he had

128

previously acted—and rightfully—as the "agency" when he permitted certain of defendant's pay schedules to become effective does not mean that he could act as the agency for all purposes, despite the prohibitions of the Executive Order, as he did on May 4, 1943. By its clear terms, the Executive Order constitutes the Panel, not the Chairman, the "agency" within the purview of the Portal Act. Consequently, the act of the Chairman of the Railway Labor Panel upon which defendant relies was not an administrative ruling, order, interpretation, regulation, or approval from an "agency of the United States", and defendant's reliance upon his ruling does not entitle it to the relief granted by Section 9 of the Portal Act.

■ Defendant also relies upon what it terms "instructions" given to it by the contracting officer of the Army Air Corps in a letter of May 10, 1943,[2] after defend-

---

[2] "Army Air Forces
Materiel Command
Wright Field, Dayton, Ohio,
May 10, 1943.
Subject: Contract w 535 ac-35714 and predecessor contracts—Labor Disputes affecting Modification Center Activities.
To: Northwest Airlines, Incorporated
1885 University Avenue
St. Paul, Minnesota
Attention: Mr. A. E. Floan, Secretary.
1. Reference is made to letters from this office dated April 19, 1943, subject as above, in which you were advised that overtime paid at your St. Paul and Vandalia Modification Centers on the basis of a forty-hour week will constitute an allowable item of cost under subject contract. This determination was made in respect of the period commencing April 1, 1943, at your St. Paul Modification Center and in respect of the commencement of operations at your Vandalia Center.
2. Since the writing of the aforesaid letters, there has been published the decision of the U. S. District Court for the Southern District of New York in the case of Brittan v. Hudson and Manhattan Railroad Company [50 F.Supp. 37.] In addition you have furnished to this office copies of correspondence between your Company and the Honorable William M. Leiserson, Chairman, National Railway Labor Panel, under date of May 4, 1943, in which you were advised that your Company and its employees, including those at the St. Paul Modification Center, are subject to the Railway Labor Act and to Executive Order No. 9299, and that the proposed payment of time and one-half for overtime after forty hours per week, as authorized April 19, 1943, by this office, would not be approved. On the other hand, you have also advised this office that approval of the proposed payment was given, on April 30, 1943, by the Minneapolis Regional Office of the War Labor Board. Moreover, in a recent advance decision (No. B-33727, April 27, 1943) the Comptroller General answered in the affirmative the following question submitted to him by the Secretary of War:
'May cost-plus-a-fixed-fee contractors with the War Department be reimbursed for (a) all amounts paid in satisfaction of final judgments entered against them in civil actions brought under the provisions of the Fair Labor Standards Act where defense of the action has been authorized by the contracting officer and (b) the reasonable and necessary costs and expenses of litigation as approved by the contracting officer?'
3. The only pertinent judicial interpretation of the Fair Labor Standards Act (i. e. the Brittan case above referred to) now indicates that this Act is not applicable to your employees in modification center operations, and such decision, in the absence of other authority, is a persuasive, if not controlling, statement of the law so far as this office is concerned. Moreover, you have advised this office that in view of the position taken by the Chairman, National Railway Labor Panel, and the severe penalties imposed in case of unauthorized wage increases, it is advisable for Northwest Airlines, for the time being, to continue to pay its employees as in the past and as prior to April 1, 1943, on the basis of a forty-eight hour week, straight time. It is understood that you will do so, and that the notice of the proposed change in basic work week heretofore given by you to your employees recited that such change would be subject to the approval of the proper Federal authorities, including the National Railway Labor Panel, so that your Company is not prejudiced by the developments since the letters from this office dated April 19, 1943.
4. In view of the foregoing, you are advised that, until further notice from this office, the letters of April 19, 1943, above referred to, will be disregarded by you. Moreover, it is determined to

ant notified him of the Railway Panel Chairman's decision. Defendant contends that these "instructions" constitute an administrative ruling or approval by an "agency" of the United States within the meaning of the Portal-to-Portal Act. But this contention is not sound.

Defendant entered into a contract with the United States to modify bombers. That contract was executed for the Government by a contracting officer of the Army Air Corps. Thus, in that transaction, the Army Air Corps was not acting as an administrative agency. It was acting as part of the executive branch of the Government and in an executive, not in an administrative agency capacity. The signature of the Air Corps contracting officers created an obligation of the United States. It acted as a contracting party, not an administrative agency. Consequently, when defendant desired to know what the Government's position was with respect to reimbursement under the contract for liability incurred under the Wage and Hour Act, it wrote the Army Air Corps, which was the other party to the contract. It wrote to the executive department which, so far as the Government's contracted liability could be acknowledged, was the United States, the contracting party. Defendant queried as to reimbursement, and what the United States contemplated under the contract with respect to it or to what it would agree concerning it. It asked no more in its original letters of March 2 and April 6, 1943. And the record indicates that it asked no more after it received Chairman Leiserson's opinion on May 4, 1943, and transmitted it to the United States Air Corps. The Air Corps letter of May 10, 1943, indicates that defendant only inquired about reimbursement, and the conditions therefor. That is the only inquiry answered by the letter. There is no evidence that defendant ever thought the Air Corps could do more than consider the reimbursement question. Defendant sought to obtain from the Government a statement of its position upon which defendant could act and to which it could require the Government to adhere. It wanted to bind the Government to liability under a contract, and if the Government refused, defendant could take the necessary steps to protect itself. It intended to, and was, dealing with a party to the contract; that is, the Army Air Corps, which could act for the party to the contract—the United States. Defendant's purpose was to make the United States liable for the reimbursement. That the Air Corps gave the reimbursement guarantee and the instructions to defendant in its executive capacity as the United States, and not as an administrative agency of the United States, follows from the fact that it acted for the Government in making the contract and also in assuming to bind the Government to guarantees made under it or as a result of it. Nowhere does defendant contend that these letters by the Air Corps do not render the Government liable for reimbursement as stated therein.

No question of any ministerial acts by the Air Corps was involved in the letters. No statute or executive order appears to show that the Air Corps is authorized to determine if airline modification centers were subject to the Railway Labor Act. The record fails to show that defendant ever sought a ruling from the Air Corps as to whether its modification center was under the Railway Act or that the Air Corps ever intended to give a ruling on that question. And defendant's contention that the contracting officer of the Army Air Corps ruled that the defendant was under the Railway Act in 1943, or that he approved of defendant going under the Act

be in the best interests of the Government for your Company, and you are hereby authorized, to resist civil actions against your Company under the Fair Labor Standards Act, not only in respect of the period prior to April 1, 1943, as heretofore directed by this office, but also until further notice in respect of any period subsequent thereto. In accordance with the decision of the Comptroller General referred to above, all amounts paid in satisfaction of final judgment against you in any such action, and the reasonable and necessary costs and expenses of litigation as approved by the Contracting Officer, constitute allowable items of costs under subject contracts.

> E. M. Weld
> Captain, Air Corps
> Contracting Officer."

as the term "approval" is used in Section 9 of the Portal-to-Portal Act, cannot be sustained. Indeed, it would seem that the Air Corps letter of May 10, 1943, indicates that defendant had decided prior to its receipt to follow Chairman Leiserson's ruling if it could obtain assurance from the Government that reimbursement would be made if recovery was obtained under the Wage and Hour Act. The defendant well knew that a captain in the Air Corps, acting as contracting officer, had no authority in administering the Railway Labor Act or the Wage and Hour Act, or to rule thereon. It seems quite apparent that its only purpose in communicating to this government officer its intention to remain under the Railway Labor Act was to obtain the necessary understanding as to reimbursement. The Air Corps contracting officer in his letter of May 10, 1943, did not declare that he approved of, or required, operation of the modification center under the Railway Labor Act. He did refer to the Brittan case and declared that that decision was a persuasive if not controlling statement of the law "as far as this office is concerned"; that is, for the purposes of that office. The purpose, of course, was to determine if reimbursement should be assured. It was not to advise defendant if it actually was under the Act. As the representative of the United States, which would have to ultimately pay any overtime incurred, he merely permitted defendant to go under the Act. A fair analysis of the entire situation requires a finding that the Air Corps neither gave its approval nor made any ruling, interpretation, order, or regulation within the meaning of Section 9 of the Portal-to-Portal Act.

No other administrative agency rulings, interpretations, regulations, orders, or approvals with respect to defendant's modification project are alleged by defendant, and no reliance upon any others seems possible on this record. Defendant does not contend and certainly has not established that any administrative practice or enforcement policy adopted by some agency for the class of employers to which defendant belonged was responsible for defendant's omissions. Upon these premises, therefore, defendant's claims under Section 9 must be rejected.

B. Should the Court Exercise the Discretion Granted by Section 11?

Section 11 permits the Court, in its discretion, to reduce the amount of liquidated damages if the employer shows to the Court's satisfaction that the omission was in good faith and that defendant had reasonable grounds for believing in good faith that its failure to pay its employees under the Wage and Hour Act was not a violation of that law. A consideration of this record leaves no doubt that defendant has made the showing required.

Defendant was a cost-plus-a-fee contractor. The costs of the project were paid by the Government. So whether the project was operated under the Wage and Hour Act or under the Railway Labor Act meant nothing to defendant financially. Its fee, or profit, was the same regardless of the law under which the project operated. So defendant had no financial motive for operating the project under the Railway Labor Act instead of the Wage and Hour Act. It had nothing to gain by the operation. In fact, the record shows that defendant believed it could have obtained trained employees more easily if it could have operated the modification center under the Wage and Hour Act. That was one of the reasons why the Army Air Force agreed, on April 19, 1943, to permit reimbursement. Defendant's attempt to obtain approval to operate the project under the Wage and Hour Act shows its good faith desire and attempt to function under the Wage and Hour Act, if it was applicable. Although plaintiffs argue that defendant did not in fact desire to operate under the Wage and Hour Act because of the accounting and administrative difficulties which defendant concedes would have arisen, and also attempt to inquire into defendant's good intentions in its conversation with Chairman Leiserson, the record contains no evidence which shows that in fact defendant did not want to operate under the Wage and Hour Act, or that it connived to avoid doing so. On the contrary, the record shows that defendant desired, and attempted to, obtain approval

to function under the Wage and Hour Act in its modification work. That defendant failed to operate under the Fair Labor Standards Act in good faith within the meaning of Section 11 of the Portal-to-Portal Act of 1947 must be concluded in the affirmative upon this record.

■ Likewise, the record also establishes that defendant had good reason for believing in good faith that it was not violating the Fair Labor Standards Act. The modification project started slowly. It started as an integral part of defendant's airlines' machine operations. Defendant first assigned its airline employees to the project. Although the project mushroomed quickly, no one at first knew if it would be permanent. Letters of intent from the Government, not a contract, constituted defendant's authority to do the work. During the first part of the project some confusion apparently existed as to segregation of the airlines and the modification work. Airlines facilities were used for modification work, and the project was operated as an integral part of the company. It was, for operation purposes and employment purposes and rights a part of the company. For an employer to conclude under these circumstances that the connection between the airline and modification work was such that it was one work is not unreasonable from a factual viewpoint. The fact that defendant erred in applying the facts under the law does not deprive it of the relief offered by Section 11 of the Portal Act. That section, by its very nature and existence, contemplates relief to employers who erred in determining their Wage and Hour liabilities. That defendant's theory was not entirely unreasonable is shown by the fact that the National Labor Relations Board adopted defendant's conclusion, even though rather hesitatingly and rejected some of its premises. The National Labor Relations Board applied the facts and considered as controlling the same facts which defendant considered controlling. Certainly, Chairman Leiserson's opinion was entitled to weight by defendant in determining if it was fulfilling its duties under the Railway Labor Act and the Wage and Hour Act. His reputation in labor matters was well established. The Army Air Corps agreement on behalf of the Government that the defendant would be reimbursed also shows that defendant had reasonable grounds for acting as it did although defendant did not rely upon that alleged "ruling or approval". Brittan v. Hudson & Manhattan R. Co., D.C.N.Y., 50 F.Supp. 37, also agrees with defendant's contentions. Because defendant's approach to the question may have been unsound does not make the grounds it relied upon unreasonable.

Although defendant at one time attempted to proceed under the Wage and Hour Act, the record nowhere shows that it had no reasonable grounds, under the circumstances, for believing that its modification project could not be operated under the Railway Act. The views expressed by other persons and by agencies of the Government would indicate that its theory was not entirely unreasonable at that time, even though unsound. Plaintiffs' arguments that defendant knew certain facts or should be charged with knowing certain facts goes mainly to defendant's good faith. Good faith exists on this record. The difficulty is that defendant drew erroneous conclusions and improperly construed the law.

■ Upon this record, defendant is entitled to a reduction of the liquidated damages, the amount of the overtime wages due, plus attorneys' fees. Such a disposition will place plaintiffs in substantially the same position as they would have been if defendant had not erred. It will likewise not punish defendant for obeying some erroneous decisions by responsible government officials and will not require of defendant any greater accuracy in the law than was exhibited by persons who were supposed to be well informed as to the problem presented. Section 11 of the Portal-to-Portal Act of 1947 is applicable and will be applied as each case comes before the Court for trial or settlement.

II. Is the Portal-to-Portal Act unconstitutional?

■ Plaintiffs question the validity of Sections 9 and 11 of the Portal-to-Portal Act. They contend that the sections violate

the United States Constitution because (1) Congress thereby attempted to exercise judicial power in violation of Article III of the United States Constitution, and (2) the sections deprive plaintiffs of their property without due process of law as required by the Fifth Amendment to the Constitution. Plaintiffs also argue that Congress' determination of an emergency cannot justify invasion of plaintiffs' rights here.

The validity of the Portal-to-Portal Act of 1947 under the Federal Constitution has been determined many times on the same grounds urged by plaintiffs here and also on similar ones. For this Court to review all the law on a problem already covered by numerous decisions which it believes correctly state the law and the result following therefrom seems useless. The arguments of plaintiffs have been considered. Sections 9 and 11 of the Portal-to-Portal Act of 1947 are valid; they do not violate the Federal Constitution. The reasoning of the courts which have upheld the Act sustains that conclusion. See, Darr v. Mutual Life Ins. Co. of N. Y., D.C.N.Y. 1947, 72 F.Supp. 752; Burfeind v. Eagle-Picher Co. of Tex., D.C.Tex.1947, 71 F.Supp. 929; Cochran v. St. Paul & Tacoma Lbr. Co., D.C.Wash.1947, 73 F.Supp. 288; Boehle v. Electro Metallurgical Co., D.C. Or.1947, 72 F.Supp. 21; Lasater v. Hercules Powder Co., D.C.Tenn.1947, 73 F. Supp. 264; Story v. Todd Houston Shipbuilding Corp., D.C.Tex.1947, 72 F.Supp. 690; Sadler v. Dickey Clay Mfg. Co., D.C. Mo.1947, 73 F.Supp. 690; Hart v Aluminum Co. of America, D.C.Pa.1947, 73 F. Supp. 727; Johnson v. Park City Consol. Mines Co., D.C.Mo.1947, 73 F.Supp. 852; May v. General Motors Corp., D.C.Ga.1947, 73 F.Supp. 878; Seese v. Bethlehem Steel Co., D.C.Md.1947, 74 F.Supp. 412; Hornbeck v. Dain Mfg. Co., D.C.S.D.Iowa, 1947, 7 F.R.D. 605; Quinn v. California Shipbuilding Corp., D.C.Cal.1947, 76 F.Supp. 742; Local 626 U. A. W. v. General Motors, D.C.Conn.1947, 76 F.Supp. 593; Cardinale v. General Motors Corp., D.C.N.Y.1947, 76 F.Supp. 743; Moeller v. Atlas Powder Co., D.C.Conn.1947, 76 F.Supp. 707; Ackerman v. J. I. Case Co., D.C.Wis.1947, 74 F.Supp. 639. In Smith v. Cudahy Packing Company, (Schempf v. Armour & Co., and Parenteau v. Swift & Co.) D.C. Minn., 1947, 76 F.Supp. 575. Judge Donovan of this Court also sustained the Act's constitutionality. In Plummer v. Minneapolis-Moline Power Co., D.C.Minn., 1948, 76 F.Supp. 745, the validity also is sustained.

Although most of these cases are concerned with the validity of Section 2 of the Portal-to-Portal Act, 29 U.S.C.A. § 252, the principles involved constitutionally are the same under the facts of this case. Both Sections 9 and 11, like Section 2, concern statutory rights existing when the Portal Act was passed. None of them deprive plaintiffs of rights which they possessed by contract or judicial determination prior to the enactment of the Portal Act. Plaintiffs also contend that, because judgments exist in favor of some seven plaintiffs in the so-called class action, the defenses now urged under the Portal-to-Portal Act cannot be sustained. The amendment to the answer, however, setting up the Portal-to-Portal defenses was permitted by the Court as to all of the remaining plaintiffs as to whom judgments had not been entered. The purpose of entering judgment in the seven cases was in pursuance of a stipulation between the parties in order to expedite the appeal on the Section 13(a) (4) question and was without prejudice to any other defenses which might be urged as to the remaining plaintiffs.

In view of the foregoing, the following summary represents the Court's views:

1. Section 9 of the Portal-to-Portal Act of 1947 does not bar this action or proceeding.

2. Defendant's failure to pay plaintiffs according to the Fair Labor Standards Act of 1938, as amended, was in good faith and defendant had reasonable, although erroneous, grounds for believing that its failure was not a violation of the Fair Labor Standards Act of 1938. Defendant is entitled to a reduction of the liquidated damages which plaintiffs will be awarded in this proceeding under Section 11 of the Portal-to-Portal Act of 1947.

3. Sections 9 and 11 of the Portal-to-Portal Act of 1947 do not violate the United States Constitution.

Findings of fact and conclusions of law in conformity herewith will be filed.

An exception is allowed.