**NORTHWEST AIRLINES, Inc. v. JACK-SON et al. and six other cases.**

Nos. 13805–13811.

United States Court of Appeals, Eighth Circuit.

Nov. 6, 1950.

As Modified on Denial of Rehearing
Jan. 23, 1951.

Linus J. Hammond, Sp. Asst. to U. S. Atty., St. Paul, Minn. (H. G. Morison, Asst. Atty. Gen., John W. Graff, U. S. Atty., St. Paul, Minn., Enoch E. Ellison and Johanna M. D'Amico, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Elmer J. Ryan, So. St. Paul, Minn., for all appellees.

A. H. Markert, St. Paul, Minn. (John A. Burns, St. Paul, Minn., on the brief), for appellees Jackson and others in No. 13805.

Charles S. Kidder, St. Paul, Minn., for interveners in No. 13805.

Mark H. Gehan, St. Paul, Minn., on the brief, for appellees in all cases except No. 13805.

Pierce Butler, St. Paul, Minn. (M. J. Doherty and Edgar G. Vaughan, and Doherty, Rumble, Butler & Mitchell, all of St. Paul, Minn., on the brief), amicus curiae, for Air Transport Assn. of America.

Before SANBORN, RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

These actions involve the claim of a large number of employees at defendant Northwest Airlines' Modification Center at St. Paul, Minnesota, for overtime pay which they claim is due them under the Fair Labor Standards Act of 1938, 29 U. S.C.A. § 201 et seq. All of the cases have

been consolidated here. This case was held under submission pending the determination of Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755. Subsequent to the decision of the Powell case the parties were granted leave to file and did file supplemental briefs. On this appeal three main questions are presented:

First, was the defendant's operation of its Modification Center that of an air carrier within the meaning of Title 2 of the Railway Labor Act[1], and as such exempt from the Fair Labor Standards Act by Section 13(a) (4) of the latter Act[2], second, if the operation of defendant's Modification Center was not that of an air carrier, were plaintiffs, employed at the Modification Center, engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act; and third, if the Fair Labor Standards Act applied to the defendant's operation of the Modification Center are plaintiffs' claims for overtime under the Fair Labor Standards Act barred by Section 9 of the Portal-to-Portal Act of 1947[3], 29 U.S.C.A. § 251 et seq.

The trial court, upon stipulation of the parties and in order to expedite the determination of each of the several questions, heard those questions separately and entered separate findings and conclusions, filed a memorandum opinion on each question, see Jackson v. Northwest Airlines, D.C., 70 F.Supp. 501; Jackson v. Northwest Airlines, D.C., 75 F.Supp. 32 and Jackson v. Northwest Airlines, D.C., 76 F.Supp. 121, and entered separate judgments on the question of the application of the Fair Labor Standards Act and the defenses under the Portal-to-Portal Act.

The facts are not seriously in dispute. They are well and fully stated by the trial court in the various memorandum opinions and hence will not be repeated in detail here.

It may and will be assumed for present purposes that the defendant was an air carrier and as such subject to the Railway Labor Act. It was exclusively engaged in the operation of a commercial airline. It maintained its own buildings, planes and equipment, and employed a large number of persons to care exclusively for its airline operations and property. With the advent of World War II, it was requested by the United States Government to perform various projects necessary to the war effort. Upon the government's request it established and operated a military air transport route from the United States to Alaska and flew supplies, equipment and

1. Section 201 of the Act provides, 45 U.S. C.A. § 181: "All of the provisions of sections 151, 152, 154–163 of this title (Title I of the Interstate Commerce Act) are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce, and * * * every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service."

2. Section 13(a). "The provisions of sections 6 and 7 * * * shall not apply with respect to * * * (4) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act; * * *." 52 Stat. 1067, 29 U.S.C.A. § 213(a) (4).

3. "Sec. 9. Reliance on Past Administrative Rulings, Etc.—In any action or proceeding commenced prior to or on or after the date of the enactment of this Act based on any act or omission prior to the date of the enactment of this Act, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect."

personnel over that route for the United States Government. In February, 1942, defendant was requested by the government to undertake the work of "modifying" army planes at the defendant's establishment in St. Paul. This so-called modification work consisted of making changes on military planes produced elsewhere. These planes were brought to the defendant's plant for the above-stated purpose from many points beyond the State of Minnesota, and after their modification were to be used in combat zones throughout the world. This work began on a comparatively small scale, but rapidly increased in extent until defendant employed in that work alone many times the number of employees who were employed in defendant's regular commercial airline work. Furthermore, these services for the government soon absorbed completely much of the defendant's plant and equipment, and, in addition, utilized many extensions of the defendant's facilities which were created for the specific purpose of enabling defendant to perform these services. The plant where this modification work was done became known as the "modification center". All of the present plaintiffs were employed upon the modification projects at the Modification Center. They were paid overtime under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., at the rate of time and a half for all hours worked in excess of 48 hours per week. They contend that they should be paid overtime for all hours worked in excess of 40, as provided by the Fair Labor Standards Act.

The defendant, in effect, contends that the modification work was work that came within the general scope of defendant's commercial airline activities and should therefore be covered by the Railway Labor Act. In connection with that contention it has been suggested that any carrier subject to the Railway Labor Act which performs any operations not characteristically those of a carrier is subject to the act in all of its activities, although some of them may not be closely connected with or related to the carrier's transportation activity.

The trial court rejected the latter interpretation of the law and held that the Fair Labor Standards Act, in exempting employees covered by the Railway Labor Act, should be strictly construed to the end that the exemption will not be enlarged beyond its necessary extent and in order that the Act will accomplish as fully as possible the remedial purposes for which it was designed. Upon that premise the trial court reached the conclusion that defendant's employees not directly engaged in defendant's air transportation activities, who, like plaintiffs here, were engaged in the modification work not directly connected with those air transportation activities, were not exempt from the Fair Labor Standards Act. With that conclusion we are in accord.

We further find from the record in this case that the trial court's judgment that the work done by plaintiffs at the defendant's Modification Center was so tenuous, negligible, and remote to defendant's operation of its commercial airline activities that the Railway Labor Act did not apply to them. As well summarized by the trial court:

"Section 13(a) (4) of the Fair Labor Standards Act, also called the Wage and Hour Act, 29 U.S.C.A. § 213(a) (4), exempts employees of carriers subject to the Railway Labor Act to the extent that the Railway Labor Act is applicable. It does not purport to exempt employees merely because the company by which they are employed is subject to the Railway Labor Act with respect to other activities in which it is engaged.

"The Railway Labor Act was intended to apply only to transportation activities and that work which bears more than a tenuous, negligible and remote relationship to the transportation activities. It was not intended to apply to all work, regardless of its connection to transportation, merely because the company carrying on the work included carrier activities within its company functions.

"Upon the facts presented, the modification activities of defendant and its employees at the modification project bear

such a tenuous, negligible, and remote, if any, relationship to the air carrier transportation activities of defendant that they cannot be considered transportation activities covered by the Railway Labor Act."

■ The question of whether the plaintiffs were engaged in the production of goods for commerce within the meaning of Sections 3(b) and 7(a) of the Fair Labor Standards Act was presented to and determined by the trial court. It is again presented on this appeal. We conclude that it is unnecessary to discuss the question in detail in this opinion, since the trial court has fully and accurately stated the facts bearing upon that question in its memorandum opinion, 75 F.Supp. 32, and in the light of those facts and the opinion of the Supreme Court in Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, it must be held that the activities in which the plaintiffs were engaged brought them within the protection of the Fair Labor Standards Act. We therefore give our approval to the judgment of the trial court on that question.

■ There remains the question of whether defendant proved that its action in paying the plaintiffs according to the directions of the Railway Labor Act instead of the Fair Labor Standards Act "was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which [it] belonged." Sec. 9, Portal-to-Portal Act of 1947, 29 U.S.C.A. § 258. If that proof was made, then under Section 9 of the Portal-to-Portal Act, the defendant must be relieved of liability for its mistake. The trial court determined this question in favor of the plaintiffs. 76 F.Supp. 121. We adopt the facts as found by the trial court on this issue. The trial court found that the defendant acted in good faith, but concluded that defendant's action was not in conformity with and in reliance on an administrative regulation, order, ruling, or interpretation of an agency of the United States, and that it was not in conformity

with or in reliance on any administrative practice or enforcement policy of any such agency with respect to the class of employers to which it belonged. There is no support in the record for the conclusion that defendant acted in conformity with or in reliance on "any administrative practice or enforcement policy of any agency of the United States with respect to the class of employers to which it [defendant] belonged," and, therefore, we need give that question no further consideration.

■ The serious question is whether under the facts disclosed by this record, and as found by the trial court, it must be held that the defendant sustained the burden of proof, which concededly was upon it, and established the fact that its action in treating itself and plaintiffs as being subject to the Railway Labor Act was in conformity with and in reliance on an "administrative regulation, order, ruling, or interpretation, of an agency of the United States."

In holding that the defendant's action was not in conformity with and in reliance on the appropriate action of an agency of the United States, the trial court did not find nor hold that there was no action on the part of anyone purporting to act as an agency of the United States. It based its conclusion upon the more narrow ground that the action purporting to be that of such agency was not actually the act of the agency within the meaning of the Portal-to-Portal Act. An examination of the propriety of that conclusion necessitates a preliminary reference to the factual situation.

As heretofore indicated, at the inception of defendant's contractual relationship with the government at its modification plant at St. Paul, defendant's activities were entirely those of an air carrier, and for the purpose of this action concededly subject to the Railway Labor Act. When defendant assumed the work which rapidly mushroomed into very extensive operations at its Modification Center, it continued to assume that it and all of its employees, both those engaged in its air transportation activities and at the Modification Center, were subject to and controlled by the provisions of the Railway Labor Act and not

the Fair Labor Standards Act. Not long thereafter, the question arose among its employees as to whether the Fair Labor Standards Act should not be applied to the Modification Center. On behalf of those employees an application was made to the National Labor Relations Board by which a ruling was sought that that Board had jurisdiction over the Modification Center employees. On February 13, 1943, that Board held that it, the Board, should not seek to exercise jurisdiction over these employees, because it appeared that the modification project was possibly subject to the Railway Labor Act and therefore exempt from the application of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and that therefore its jurisdiction should not be asserted over the modification project until a National Mediation Board clearly declined jurisdiction under the Railway Labor Act.

Following that ruling by the National Labor Relations Board, and on February 26, 1943, the administrator of the Wage and Hour Division of the Department of Labor issued a written statement of his interpretation of the Section 13(a) (4) exemption of the Fair Labor Standards Act in which he stated that if the activities at the Modification Center in fact bore a reasonably close relationship to air transport activities, the provisions of the Section 13(a) (4) exemption should apply, with the result that the employees engaged in those activities would not be covered by the Fair Labor Standards Act.

On March 2, 1943, and April 6, 1943, the defendant communicated with the Air Corps, calling attention to the Administrator's written interpretation and stating that apparently its modification activities were exempt from the Wage and Hour Act, and requesting assurance that the defendant would be reimbursed by the government for any liability which might be incurred under the Wage and Hour Act because of defendant's continued operation under the Railway Labor Act.

It appears that in February or March, 1943, some of defendant's modification employees had already commenced actions for wages due under the Wage and Hour Act.

On March 11, 1943, the Chairman of the National Railway Labor Panel formally approved pay schedules for modification project employees under the Railway Labor Act.

In spite of the foregoing actions on the part of the various government officials referred to, possibly because defendant believed that the question was close (as stated by the trial court), possibly because of competition in the labor market, defendant decided to make changes in its operating procedure which would justify the position that it was operating the Modification Center separately from the air transport activities, with the result that it could thereby make the Modification Center activities subject to the Fair Labor Standards Act and permit it to pay the higher wages authorized by that Act. It advised the contracting officer of the Army Air Corps that it had made such changes and desired to pay overtime under the Fair Labor Standards Act. In response to that notification the Chief of the Army Air Corps Procurement Division on April 19, 1943, wrote defendant's secretary that wages, including overtime, paid in conformity with the Wage and Hour Act (the Fair Labor Standards Act) would be allowable items of cost under the contract with the government.

Immediately after the receipt of this communication from the Chief of the Army Air Corps Procurement Division, defendant posted a notice to its employees stating that, subject to a contrary ruling by a government agency or change in the law, the Modification Center would function under the Fair Labor Standards Act. It then made inquiry of the National War Labor Board if Board approval was required in order for defendant to adopt a 40-hour week with time and a half for overtime over 40 hours. The board answered to the effect that the suggested course of action was permissible.

But on May 4, 1943, it appears that one of defendant's officers had a conference with the Chairman of the National Railway Labor Panel concerning the changeover to the Wage and Hour Act (Fair Labor Standards Act), and that as a result of that con-

ference letters were exchanged between the defendant and the Chairman in which defendant was informed that the Modification Center was covered by the Railway Labor Act and that the proposed payment of time and a half for overtime after 40 hours could not be approved. The defendant then informed the Air Corps of the Chairman's ruling, whereupon the Air Corps contracting officer wrote defendant that its Modification Center could operate on the 48-hour week and that the government would assume liability for any judgments resulting from successful actions under the Wage and Hour Act. Immediately thereafter, on May 17, 1943, defendant posted another notice to its employees, informing them that the federal authorities had refused to permit the Modification Center to operate on a 40-hour week under the Wage and Hour Act and that therefore it would continue to operate that project on the basis of the 48-hour week. Thereafter the defendant operated under the Railway Labor Act until the project was finished.

It appears that in March, 1945, upon inquiry of the Secretary of Labor by defendant whether defendant was subject to Executive Order 9240, 40 U.S.C.A. § 326 note, that a special assistant to the Secretary notified defendant that it was subject to that order relating to premium pay, but that order was reversed on June 1, 1945, upon representations by defendant to the Department of Labor that the relationship between the Modification Center work and the airline activities was close and not unrelated.

On March 29, 1945, defendant requested the Air Force Procurement Division to reaffirm its guarantee made in 1943 that defendant would be reimbursed for any liability incurred as a result of its conforming to the Railway Labor Act instead of the Fair Labor Standards Act (Wage and Hour Act). This request was complied with. Since defendant's contract with the government was on a cost-plus-a-fixed-fee basis, it gained no financial advantage from operating under the Railway Labor Act.

It will be noted from a reference to the trial court's memorandum opinion in Jackson v. Northwest Airlines, 76 F.Supp. 121, that the foregoing facts are substantially a recitation of facts stated in the trial court's memorandum. We restate those facts substantially in the language of the trial judge in order that there may be no question that we accept and apply the facts as found by the trial court.

In its formal findings on this issue (not reported), the trial court found: "On or about May 4, 1943, the Chairman of the National Labor Railway Panel advised defendant, after defendant made inquiry of him, that the modification project must be operated pursuant to the Railway Labor Act, not the Fair Labor Standards Act, as defendant had requested. Defendant acted in conformity with, and in reliance on, that opinion in good faith. The denial to defendant of the right to pay its modification employees according to the Fair Labor Standards Act was not submitted by the Chairman of the Panel to an Emergency Board or any other board or persons. The powers of the Chairman were granted by Executive Orders."

In its conclusions of law, the trial court states: "The Chairman of the Railway Labor Panel exceeded the authority conferred upon him in so far as he attempted to order or require defendant to operate the modification project under, and pay plaintiffs according to, the Railway Labor Act. He could not, and did not, act as an agency of the United States within the meaning of Section 9 of the Portal-to-Portal Act of 1947."

It thus appears that the trial court's conclusion on this question turned upon that court's interpretation of the powers and capacity of the Chairman of the National Railway Labor Panel. It further clearly appears that had the trial court concluded that the Chairman of the National Railway Labor Panel had acted as an agency of the United States Government in making his ruling that the court would have concluded that defendant had sustained its burden of proof in establishing that it had acted in good faith, in conformity with, and in reliance on, a ruling of an agency of the United States. The formal finding above quoted leaves no alternative to that conclusion.

It is our judgment that in construing the Executive Orders which created the National Railway Labor Panel and fixed the powers, duties, and authority of the Chairman of the Panel, the trial court placed too narrow a construction upon those orders.

Executive Order No. 9172, dated May 22, 1942, 7 F.R. 3913, created the National Railway Labor Panel. It provides that the Panel shall consist of nine members; that the President shall designate a Chairman from the members of the panel; that should a dispute arise between a carrier and its employees, not referable to the National Railroad Adjustment Board, which is not settled under the provisions of certain sections of the Railway Labor Act, representatives of employees involved might under certain conditions notify the Chairman of the Panel of the failure of the parties to adjust the dispute, and that if in the judgment of the Chairman of the Panel the dispute should be of such character that if unadjusted it might interfere with the prosecution of the war, "he may thereupon select three members of the Panel to serve as an emergency board to investigate such dispute and to report thereon to the President."

By Executive Order 9299, dated February 4, 1943, 8 F.R. 1669, 45 U.S.C.A. § 156, Note, it is provided that, except under certain circumstances immaterial here, no carrier could make any change in wage rates "unless notice of such proposed change shall have been filed with the Chairman of the National Railway Labor Panel, created by Executive Order No. 9172, and shall have been permitted to become effective as hereinafter provided." Thereafter in that Executive Order appears the following language: "3. If the Chairman of the National Railway Labor Panel has reason to believe that the proposed change, in wage rates or salary, may not conform to the standards prescribed in Executive Order No. 9250, or to the general stabilization program made effective thereunder, or to the directives on policy issued by the Economic Stabilization Director thereunder *and the proposed change is not modified to conform to such standards, program, and directives,* he shall

designate three members of the Panel as an Emergency Board to investigate the proposed change and to report to the President. *Otherwise, the Chairman of the Panel may permit the proposed change to become effective.*" (Italics ours.)

Paragraph 5 of Executive Order 9299 provides that copies of the report of the Emergency Boards and the recommendations of the Boards made to the President shall be filed by the Boards forthwith with the Director of Economic Stabilization, the National War Labor Board, and the Commissioner of Internal Revenue; that the Director of Economic Stabilization may on behalf of himself or other departments and agencies concerned report to the President the effect of the recommendations on the general stabilization program. Section 5 further provides that unless and except to the extent that the Director of Economic Stabilization shall otherwise direct, the recommendations of the Emergency Board in regard to proposed changes affecting wages and salary payments shall, upon the expiration of 30 days after the report is filed with the President, become effective.

We are of the opinion that to hold that a formal ruling made by the Chairman of the National Railway Labor Panel *which is complied with* does not amount to a ruling of a government agency is an unjustifiably narrow construction of the intent and necessary implications of the Executive Orders in question. It is true that, as the trial court concluded, the Chairman did not have final authority. But he did have primary authority. Executive Order 9299 expressly provides that when a wage and salary adjustment is presented to him and he concludes, or, as the order provides—"has reason to believe"— that the proposed wage adjustment may not conform to the stabilization program or the directives of the Economic Stabilization Director, and *if the proposed change is not modified to conform to such standards, program and directives,* he should then designate the Emergency Board, but not until then. Necessarily that contemplates an expression or ruling on the part of the Chairman to the appli-

cant for the proposed change in wage schedules, and a formal expression by the Chairman of his ruling on the question of whether the proposed schedule conforms to the stabilization program. Contemplating such a ruling, the Executive Order certainly sanctions it and makes no provision for a review of the Chairman's ruling if the ruling is complied with. The result in our opinion must be that such a ruling is, if complied with, a formal ruling of the agency. Only when the Chairman's ruling is not complied with is there any requirement for an Emergency Board. And the fact that if it is complied with there is no necessity for the Emergency Board compels the conclusion in our judgment that the Chairman's action is formal and is, unless disregarded, the final ruling of the Agency. To hold otherwise would require that anyone submitting a proposed schedule of wages for approval, under these Executive Orders would be required, before it could rely upon a ruling as the ruling of the Panel, that it not only submit the schedule to the Chairman but that it must obtain the disapproval of the Chairman, that it must then see that an Emergency Board is created, that the Emergency Board rule upon it, that the Board then file its recommendations and findings with the Director of Economic Stabilization and the President, and that it must then wait 30 days to see if the Stabilization Director reversed the Board or if the President reversed the Director of Economic Stabilization.

■ It is our conclusion that the ruling of the Chairman of the National Railway Labor Panel was, under the facts of this case, the administrative ruling of the Panel, and that that Panel was an Agency of the United States within the meaning of the Portal-to-Portal Act. It follows, therefore, that under the facts in this case as found by the trial court the defendant did establish that its action in paying the plaintiffs overtime under the Railway Labor Act and not under the Fair Labor Standards Act was in good faith and in conformity with and in reliance on an administrative order and ruling of an agency of the United States, and that the defendant's

defense under Section 9 of the Portal-to-Portal Act should have been sustained.

In accordance with the views expressed above, the judgments of the District Court holding that plaintiffs' activities were not controlled by the Railway Labor Act, that plaintiffs were engaged in the production of goods for commerce, and that the Fair Labor Standards Act applied to plaintiffs' employment are affirmed, and the judgment of the trial court entered on April 22, 1948, holding that Section 9 of the Portal-to-Portal Act of 1947 does not bar plaintiffs from recovering in these actions for overtime pay due them under the Fair Labor Standards Act of 1938, as amended, is reversed, and the cause is remanded with directions to enter judgment for the appellant.

Affirmed in part and reversed in part.